840 F.2d 1139
 46 Fair Empl.Prac.Cas. 272,
46 Empl. Prac. Dec. P 37,852, 56 USLW 2530,
2 Indiv.Empl.Rts.Cas. 1825, 1 A.D. Cases 1222
 James B. COPELAND, Appellant
v.
The PHILADELPHIA POLICE DEPARTMENT, and Kevin Tucker, sued
in his official capacity as Police Commissioner for the City
of Philadelphia, and William Reed, sued in his official
capacity as Staff Inspector for the Internal Affairs Bureau
of the Philadelphia Police Department.
 No. 87-1256.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 16, 1987.
Decided March 7, 1988.
Rehearing Denied April 5, 1988.
 
 Andrew F. Erba (argued), Loralyn McKinley, Philadelphia, Pa., for appellant.
 Susan Shinkman (argued), Divisional Deputy City Sol., Philadelphia, Pa., for appellees.
 Richard K. Willard, Asst. Atty. Gen., Edward S.G. Dennis, Jr., U.S. Atty., Leonard Schaitman, Robert V. Zener, Attys., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for amicus curiae U.S.
 Before SEITZ, HUTCHINSON and ALDISERT, Circuit Judges.OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 Appellant James Copeland appeals from the order of the district court granting summary judgment to defendants on all of Copeland's federal claims. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 I.
 
 2
 We proceed to narrate the undisputed facts of record. In March 1985, Copeland, a Philadelphia policeman, had been found to be off his beat in the company of a fellow officer, who was alleged to be selling drugs and who was dismissed for the use of illegal drugs. Copeland submitted to a urinalysis following this incident, and the results were negative. He was, however, suspended from the Philadelphia Police Department ("the department") for fifteen days because on three occasions he had been off his beat while reporting otherwise in his patrol log and once he had used his private vehicle on his beat without permission.
 
 
 3
 In October 1985, Copeland was accused by his former girlfriend Marion Brickhouse, also a police officer, of having used illegal drugs in her presence. She leveled the accusation following a heated altercation with Copeland. She made the accusation to Captain Willie Williams, Copeland's commanding officer.
 
 
 4
 In response to Brickhouse's allegation, an investigation was launched by Staff Inspector William Reed of the Internal Affairs Bureau of the department. Reed had also conducted the investigation that resulted in Copeland's previous suspension. During the first two months of the investigation no further evidence implicating Copeland in drug use was uncovered; none of the police officers interviewed indicated that they had any reason to believe that Copeland used drugs. Furthermore, Brickhouse retracted her allegation and also denied having accused Copeland. Based on this evidence, in December 1985, Copeland was ordered to submit to a urinalysis.
 
 
 5
 Copeland's urine sample was delivered to a private testing laboratory, where it was placed in an unlocked refrigerator. Three tests performed over a period of one month indicated the presence of cannabinoids (i.e., marijuana or hashish) in Copeland's urine, at levels of 75, 35, and 25 ng/ml, respectively. The laboratory report, delivered to the department, stated that these levels were "too high to be consistent with passive inhalation."[1]
 
 
 6
 Based on these results, on January 22, 1986, Copeland was interviewed by Inspector Reed, who orally informed Copeland that he had tested positive. Copeland denied using marijuana. When pressed for an explanation, Copeland offered the possibility that the positive test results were caused by passive inhalation of marijuana; Copeland stated that during the weekend immediately preceding his submitting to the urinalysis he had worked as a security guard in a Philadelphia hotel where the hallways were filled with marijuana smoke.
 
 
 7
 At the conclusion of his interview with Reed, Copeland was suspended with intent to dismiss. On January 30, 1986, Copeland received a Notice of Intention to Dismiss. Effective February 9, 1986, Copeland was discharged from the department.[2]
 
 
 8
 Copeland filed this action in the district court in April 1986, seeking reinstatement, back pay, compensatory and punitive damages, and a declaratory judgment that his constitutional rights and statutory rights had been violated. He named as defendants the City of Philadelphia, Police Commissioner Kevin Tucker, and Staff Inspector William Reed (collectively "the city"). The district court granted the city's motion for summary judgment on all the federal claims and allowed the pendent state law claims to be withdrawn. The district court's decision was apparently based on the conclusion that no constitutional or statutory violations had been proved and that the individual defendants were entitled to the benefit of qualified immunity because of their good faith. This appeal followed.
 
 II.
 
 9
 We are ordinarily required to address the validity of the qualified immunity defense as an initial matter, but, because the qualified immunity defense is not available to a municipality, Hynson v. City of Chester, 827 F.2d 932, 934 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988), and protects government officials only from civil liability in damages, id., we must, in any event, reach the merits of Copeland's claims. Therefore, we put aside the issue of the applicability of the qualified immunity defense based on the facts of this case.
 
 
 10
 On appeal, Copeland contends that factual disputes made the granting of summary judgment improper as to his claims that the city violated his federal constitutional and statutory rights in the following respects: unreasonable search and seizure; lack of procedural due process; denial of substantive due process; denial of equal protection; invasion of the liberty interest in his reputation; and failure to accord him the benefit of section 504 of the Rehabilitation Act of 1973 ("the Act"). See 29 U.S.C. Sec. 794 (1982). We will address these issues seriatim.
 
 
 11
 Because the district court granted the city's motion for summary judgment, our review is plenary. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).
 
 A. Unreasonable Search and Seizure
 
 12
 Copeland contends that the district court erred in granting summary judgment to the city on his claim that the city violated his right to be free from unreasonable search and seizure as guaranteed by the fourth and fourteenth amendments by ordering him to submit to a urinalysis.[3] Copeland argues that the grant of summary judgment was inappropriate because factual disputes exist as to the propriety of the search and because the court committed legal error in finding that the search comported with the governing constitutional standard.
 
 
 13
 As noted, Copeland asserts that compulsory urinalysis under these conditions constituted a search for fourth amendment purposes. The city does not dispute that the fourth amendment is implicated by this compelled urinalysis. See Shoemaker v. Handel, 795 F.2d 1136, 1142 (3d Cir.1986) (treating compulsory urinalyses of jockeys as searches within the meaning of the fourth amendment). Given the nature of the search, we are satisfied that the fourth amendment is applicable.
 
 
 14
 Next, we address the propriety of this search. New Jersey v. T.L.O., 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985). Both parties agree that the proper standard for evaluating the particularized search by the department of its officer in this case is whether the department had a reasonable suspicion that Copeland was a user of illegal drugs. This standard has been applied by the courts in a variety of contexts, including compelled urinalysis, and we deem it appropriate here. See, e.g., id. at 341, 105 S.Ct. at 742 ("Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.")
 
 
 15
 The standard requires an objective evaluation of whether reasonable suspicion existed. O'Connor v. Ortega, --- U.S. ----, 107 S.Ct. 1492, 1503, 94 L.Ed.2d 714 (1987) (O'Connor, J., plurality opinion); T.L.O., 469 U.S. at 341, 105 S.Ct. at 742; see also United States v. Hawkins, 811 F.2d 210, 213 (3d Cir.1987). The suspicion must be directed at a particular individual. See Ybarra v. Illinois, 444 U.S. 85, 92-93, 100 S.Ct. 338, 342-43, 62 L.Ed.2d 238 (1979). Although the reasonable suspicion standard lacks some specificity, one court has noted that factors that may affect the reasonableness of the suspicion are "(1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof." Security & Law Enforcement Employees, Dist. Council 82 v. Carey, 737 F.2d 187, 205 (2d Cir.1984) (in the context of strip searches of prison guards).
 
 
 16
 Copeland concedes that Brickhouse's accusation provided the city with sufficient cause to launch the investigation into his alleged use of drugs. He contends, however, that the city lacked reasonable suspicion to compel him to submit to the urinalysis. We therefore consider whether the city had sufficient evidence at the time of the compelled urinalysis to support an objectively reasonable suspicion that Copeland used illegal drugs. Copeland maintains that during its two-month investigation the city uncovered no evidence corroborating the allegation that he used illegal drugs, that Brickhouse recanted her accusation, that the city was aware of the emotional nature of the events that surrounded Brickhouse's statement, and that the length of time between Brickhouse's accusation and the compelled urinalysis vitiated the evidentiary value of the accusation.
 
 
 17
 We must reject Copeland's contention. Although events that occurred following Brickhouse's statement did not bolster the strength of the city's case against Copeland, the urinalysis was ordered on the basis of the first-hand observations of a police officer that Copeland had used illegal drugs in her presence within the previous several months. This evidence was sufficient to support a finding of reasonable suspicion that Copeland used illegal drugs. The time lapse and the other factors do not negate this conclusion. Therefore, the district court did not err in granting summary judgment in favor of the city on Copeland's fourth amendment claim.[4]
 
 B. Lack of Procedural Due Process
 
 18
 Copeland alleges that summary judgment was improper as to his procedural due process claim because there were disputed factual issues bearing on the reasonableness of the pretermination procedures utilized in his case. The parties agree that Copeland has a cognizable property interest in his employment sufficient to trigger the procedural due process requirements of the fourteenth amendment. Therefore, the city was required to provide Copeland with notice and an opportunity for a hearing prior to terminating his employment. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).
 
 
 19
 In Gniotek v. City of Philadelphia, 808 F.2d 241 (3d Cir.1986), we examined the procedures used by the Philadelphia police department in disciplining several officers implicated in police corruption and concluded that those procedures satisfied procedural due process requirements. Gniotek involved six police officers who were named by government witnesses during criminal trials as having received bribes. The day after each officer was named, the commanding officer of the department's Ethics Accountability Division executed a Notice of Suspension with Intent to Dismiss for each. He then summoned the officers. Each officer appeared with counsel and was interviewed individually. Each was given a form that contained a summary of the evidence against him and a recitation of Miranda rights.[5] Each officer declined to respond to the charges against him. Thereupon, each was given the pre-prepared suspension notice. Four days later, each officer was served with a Notice of Intention to Dismiss; this notice specified the charges against the officer and informed him of his right to submit to the police commissioner the reasons why he felt that the termination was unjustified. None took advantage of this opportunity. Each was subsequently dismissed from the department. Gniotek, 808 F.2d at 242-44.
 
 
 20
 Copeland asserts that the procedures afforded him were qualitatively different from those approved in Gniotek. He notes that he was not provided with written notice of the charges and was provided with virtually no information concerning the evidence against him other than that the urinalysis produced positive results. Copeland also observes that only at the conclusion of the hearing was he informed that the city intended to suspend him with intent to dismiss. Finally, he notes that the formal charges against him were not prepared until February 11, 1986, two days after he was actually dismissed. We shall discuss these arguments in order.
 
 
 21
 Before his hearing, Copeland was informed by his commanding officer that the urinalysis indicated that Copeland had used marijuana. Inspector Reed also told him of this finding during his hearing. Contrary to Copeland's contention, the due process clause can be satisfied by oral notice. Loudermill, 470 U.S. at 546, 105 S.Ct. at 1495.
 
 
 22
 Given Copeland's status as a police officer, his having submitted to a prior urinalysis, his awareness of the reason for the current test, and his being advised that he had tested positive, we think that the information provided him by the city was sufficient to fulfill the due process requirement that he be apprised of "the substance of relevant supporting evidence" against him. Brock v. Roadway Express, Inc., --- U.S. ----, 107 S.Ct. 1740, 1749, 95 L.Ed.2d 239 (1987). Although it might have been desirable for the city to have advised him of the specific test results appearing in the report, we cannot say that failure of the city to provide such information amounted to a constitutional violation under these circumstances.[6]
 
 
 23
 Copeland next maintains that he was denied procedural due process because he was informed of the fact that Reed intended to suspend him with intent to dismiss only at the end of the hearing rather than at its outset. This contention lacks merit. The procedure employed by the city permitted Copeland to explain the urinalysis results. Copeland did in fact present his version of why the urinalysis results were positive. That Reed did not believe Copeland's explanation and issued the pre-prepared suspension notice did not violate Copeland's constitutionally protected right to due process. Moreover, in Gniotek the police officers were not informed of the intent to suspend them until the conclusion of their hearings. Gniotek, 808 F.2d at 242. We, of course, concluded that those procedures satisfied the due process clause.
 
 
 24
 Copeland asserts that the fact that the city did not prepare the formal, written charges against him until after he had been dismissed violated his right to due process by depriving him of notice and the opportunity to be heard. Before the written charges were prepared, however, Copeland was afforded notice and a hearing on what we consider to be the charge for which he was actually dismissed, i.e., use of an illegal drug.[7] The formal charge was based on the same information previously made available to Copeland, which he had the opportunity to refute. The fact that the specific charge was drafted after he had already been terminated does not constitute a violation of Copeland's right to procedural due process under the present circumstances.
 
 
 25
 We find no merit to Copeland's assertion that the post-termination procedures provided for were unduly lengthy. Copeland failed to exercise his right to appeal his dismissal to the Civil Service Commission. Instead, he requested arbitration pursuant to the collective bargaining agreement between the Fraternal Order of Police and the City of Philadelphia; the arbitration hearing originally scheduled for October 1986 has been continued pending the resolution of this litigation. Based on these facts, we do not believe that the post-termination procedures available to Copeland violated any constitutional guarantee.
 
 C. Lack of Substantive Due Process
 
 26
 Copeland asserts that the existence of unresolved factual questions rendered summary judgment inappropriate on his claim that the city violated his right to substantive due process. Specifically, Copeland charges that: (1) the city dismissed him based on insufficient evidence; (2) the staff investigator who conducted the investigation of Copeland misrepresented the validity of the evidence to Copeland's commanding officer; and (3) the city failed to articulate objective standards to guide decisionmaking in the context of compelled urinalysis.
 
 
 27
 The substantive component of the due process clause bars certain government actions "regardless of the fairness of the procedures used to implement them." Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). To determine whether a right protected by the guarantee of substantive due process has been violated, the court must "balance 'the liberty of the individual' and 'the demands of organized society.' " Youngberg v. Romeo, 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982) (quoting Poe v. Ullman, 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)).
 
 
 28
 To support his claim that the city lacked sufficient evidence to dismiss him, Copeland cites the lack of security measures to safeguard the integrity of his urine sample at the laboratory;[8] the unreliability of drug testing in general; and the assistant laboratory director's concessions in his deposition that there are possibilities for error from various sources in the testing process and that he could not definitively exclude the possibility that Copeland's urinalysis results could have been caused by passive inhalation. We do not believe, in the present context, that any alleged infirmities in the testing procedures and the reliability of the evidence so infringed Copeland's liberty as to violate his substantive due process right. As the Supreme Court has stated:
 
 
 29
 In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.
 
 
 30
 Bishop v. Wood, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976).[9]
 
 
 31
 Copeland also argues that Inspector Reed did not investigate the possibility of errors in the test but nevertheless reported to Captain Williams that he had examined this matter. Our reading of the record does not sustain this contention. Williams asked Reed whether Copeland's test results could have been caused by passive inhalation; Reed's response was based on the information contained in the laboratory report. The record does not support the contention that Reed misrepresented to Williams the extent of his inquiries.
 
 
 32
 Finally, Copeland contends that the order compelling him to submit to the urinalysis was unconstitutionally arbitrary because the city has not articulated any objective standards governing the circumstances under which a police officer can be compelled to undergo drug testing. Whatever abstract merit there might be to Copeland's argument, we reject it in the present context because, as we have already concluded, the city applied the correct standard in compelling him to submit to the urinalysis. Although written standards would be preferable, the city's actions were not of the kind that, procedural safeguards aside, are barred by the substantive component of the due process clause.
 
 
 33
 The various allegations raised by Copeland under the rubric of substantive due process do not, either singly or in conjunction, support the conclusion that Copeland's constitutional rights were violated. Based on the record before it, the district court properly granted the city's motion for summary judgment on Copeland's substantive due process claims.
 
 D. Denial of Equal Protection
 
 34
 Copeland contends that the district court committed legal error in granting the city's motion for summary judgment on his claim that the city violated his rights under the equal protection clause of the fourteenth amendment. He argues that the city treats differently police officers who are similarly situated and that the basis for this disparate treatment is not rationally related to a legitimate government interest. Specifically, Copeland notes that police officers alleged to have violated state laws barring possession or use of certain drugs are treated more severely than officers who violate state criminal laws regarding alcohol abuse, such as public drunkenness or driving while under the influence of alcohol. He maintains that both alcohol and drug abuse are treatable illnesses and thus must be treated similarly by the city.
 
 
 35
 Copeland does not contend that drug users are a suspect class for purposes of equal protection analysis. Thus, the classification scheme Copeland challenges will withstand constitutional scrutiny if it is rationally related to a legitimate government interest.
 
 
 36
 The city concedes that it treats officers who commit drug offenses differently from those who violate alcohol abuse laws. It contends that a rational distinction exists between the two categories of officers: one group commits a criminal offense merely by possessing or using illegal drugs whereas the second group engages in an activity--the consumption of alcohol--that is not per se unlawful.
 
 
 37
 Because the distinction drawn by the city is being applied to law enforcement officers, we cannot say that the distinction lacks a rational basis here. Police officers are sworn to uphold the laws of the land. The city has an obvious and legitimate interest in maintaining public trust in the police department. To ensure these values, the city certainly has the authority to dismiss police officers who use illegal drugs. We therefore conclude that the city did not violate Copeland's constitutional guarantee of equal protection by treating him more severely than it treats those who violate the law by the abuse of alcoholic products.
 
 
 38
 Nor do we accept Copeland's contention based on equal protection that because both alcohol and drug abuse are treatable illnesses the city must provide drug abusers with an opportunity to enter the same rehabilitative programs provided to alcoholics. Whatever merits this argument may have in other contexts, our equal protection analysis is unaffected by the argument that abuse of various substances may be caused by an illness.
 
 
 39
 E. Invasion of the Liberty Interest in Reputation
 
 
 40
 Copeland contends that the conduct of the city deprived him of his liberty interest in his reputation, which is protected by the due process clause of the fourteenth amendment. He argues that disputed factual matters relating to his claim made it improper for the district court to grant summary judgment.
 
 
 41
 Copeland possesses a liberty interest in his reputation that is implicated by his dismissal on the ground that he used an illegal drug. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). To succeed on a claim based on this interest, Copeland must produce evidence that the reason for his termination was made public by the city. Bishop v. Wood, 426 U.S. at 348, 96 S.Ct. at 2079. Copeland has not done so. He merely alleges that the presence of information relating to his termination in his personnel file raises an inference that the city intends to communicate this information to prospective employers. He further asserts that the fact that he was unsuccessful in finding employment for more than a year after he was dismissed from the department "strengthens this inference."
 
 
 42
 Such assertions are, however, insufficient to defeat a motion for summary judgment. Copeland has thus failed to produce the evidence necessary to support his assertion that the city violated his liberty interest.
 
 
 43
 F. Failure to Accord Benefits of the Rehabilitation Act
 
 
 44
 Copeland contends that the district court erred in granting the city's motion for summary judgment on his claim that the city discriminated against him on the basis of a real or perceived handicap in violation of section 504 of the Act. See 29 U.S.C. Sec. 794 (1982). Section 504 provides in relevant part:
 
 
 45
 No otherwise qualified handicapped individual ... shall solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....
 
 
 46
 A private right of action is created by section 504. Strathie v. Department of Transp., 716 F.2d 227, 229 (3d Cir.1983). To succeed in such a claim, an individual must prove "(1) that he is a 'handicapped individual' under the Act, (2) that he is 'otherwise qualified' for the position sought, (3) that he was excluded from the position sought solely by reason of his handicap, and (4) that the program or activity in question receives federal financial assistance." Id. at 230. We assume, without deciding, that Copeland has offered enough evidence to support points 1, 3, and 4. We thus consider whether Copeland is otherwise qualified for the position of police officer.
 
 
 47
 To determine whether a person is otherwise qualified, our court in Strathie established the following standard: "A handicapped individual ... is not otherwise qualified if there is a factual basis in the record reasonably demonstrating that accommodating that individual would require ... a modification of the essential nature of the program...." Id. at 231; see also School Bd. of Nassau County v. Arline, --- U.S. ----, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987).
 
 
 48
 Copeland asserts that the Act permits analysis only of whether accommodation of physical handicaps is possible, that is, that the examination of "moral" qualifications is beyond the scope of the Act. He argues that his thirteen-year service record proves that he satisfies the requirement that he "can perform 'the essential functions' of the job in question." Arline, 107 S.Ct. at 1131 n. 17 (quoting 45 C.F.R. Sec. 84.3(k)). Because the police department assigns police officers who are alcoholics or who are found to have violated state laws regarding alcohol abuse (e.g., public drunkenness, driving while intoxicated) to a police department-operated rehabilitation program, Copeland argues by way of analogy that reasonable accommodation of his handicap is possible.
 
 
 49
 The city and the United States as amicus assert that the statutory construction advanced by Copeland is unduly narrow. They contend that the phrase "otherwise qualified" permits analysis of whether accommodation is possible in light of all aspects of the job, not merely its physical requirements. They assert that the very nature of the job requires that a police officer not engage in unlawful behavior because it is a police officer's duty to enforce the laws.
 
 
 50
 We conclude that accommodating a drug user within the ranks of the police department would constitute a "substantial modification" of the essential functions of the police department and would cast doubt upon the integrity of the police force. No rehabilitation program can alter the fact that a police officer violates the laws he is sworn to enforce by the very act of using illegal drugs.
 
 
 51
 Because a police department is justified in concluding that it cannot properly accommodate a user of illegal drugs within its ranks, we conclude that Copeland is not otherwise qualified for the position and thus does not qualify for the protections afforded by the Act. Therefore, the district court properly granted the city's motion for summary judgment on Copeland's claim that his dismissal violated the provisions of the Act.
 
 III.
 
 52
 For the foregoing reasons, the judgment of the district court will be affirmed.
 
 
 
 [1]
 The assistant laboratory director conceded in his deposition in the district court that he could not state definitively whether these results were caused by active or passive inhalation. He stated that most scientific studies indicate that levels up to 20 to 30 ng/ml could be attributable to passive inhalation
 
 
 [2]
 Prior to his dismissal, it appears that Copeland did not exercise his right under the regulations of the Civil Service Commission to notify the Police Commissioner in writing of his belief that the intended dismissal was unjustified and of the facts in support of his belief. Nor did he appeal his dismissal to the Civil Service Commission as was permitted under the Philadelphia Home Rule Charter. Copeland's arbitration proceeding under the department's collective bargaining agreement has been stayed pending the outcome of this litigation
 
 
 [3]
 Although Copeland also contends that his being compelled to submit to the urinalysis violated his right to privacy, his argument is based entirely on fourth amendment principles. Therefore, we will address his right to privacy claims within the context of our analysis of his fourth amendment arguments
 
 
 [4]
 In view of our conclusion, we need not consider the city's contention that justification for the search could also be based on the fact that Copeland had previously been investigated for alleged use of illegal drugs
 
 
 [5]
 For example, Gniotek's form stated, in relevant part: "We are questioning you concerning testimony presented in Federal Court under oath by Eugene Boris an admitted number writer, that he paid you $60 per month for an extended period beginning in 1982 for protection of his illegal activities." Gniotek v. City of Philadelphia, 808 F.2d 241, 244 (3d Cir.1986)
 
 
 [6]
 We are not of course called upon to decide whether Copeland could demand to review the laboratory report during the course of any subsequent proceeding
 
 
 [7]
 The formal charges also included the specification that Copeland had previously been investigated for drug use and other serious violations of department rules and had been suspended for specified violations. We note, however, that the basis for the pretermination hearing, the Notice of Intention to Dismiss, and the Notice of Dismissal was solely the positive urinalysis. Therefore, we think that for present purposes we need only consider issues stemming from the charge and specification that Copeland used an illegal drug
 
 
 [8]
 During discovery pertaining to this action, it was revealed that several employees of the laboratory had access to the refrigerator and consequently to the sample. While in the laboratory's refrigerator, the sample was not sealed
 
 
 [9]
 Although relief is not available to Copeland under the doctrine of substantive due process, he may of course raise these allegations of the insufficiency of the evidence against him in his arbitration proceedings