NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2144
_____

WILLIAM GILSON,
Appellant

v.

PENNSYLVANIA STATE POLICE, an agency of the
Commonwealth of Pennsylvania; MARK SCHAU;
KYLE TETER; LISA S. CHRISTIE; WILLIAM SIBBALD;
DEBRA FACCIOLO; FRANK NOONAN
_____


On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 1-12-cv-00002
District Judge: The Honorable Mark R. Hornak

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 12, 2017

Before: SMITH, *Chief Judge,* JORDAN, and SHWARTZ, *Circuit Judges*

(Filed: January 23, 2017)
_____

OPINION[*]
_____

SMITH, *Chief Judge.*

William Gilson appeals the order of the District Court granting summary judgment

in favor of his former employer, the Pennsylvania State Police ("PSP") and related

_____
[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

individual defendants, on his claims of deprivation of due process and gender discrimination arising from his termination from the PSP. We will affirm.

## I.

Trooper Gilson was employed by the PSP from 1994 to 2011. On August 17, 2009, Gilson and others, including Trooper William Sibbald, Jr., responded to an incident involving the involuntary commitment of a young man. Sandra Grgic, a female crisis services worker, was also present at the scene. It is undisputed that Trooper Gilson briefly had physical contact with Grgic, although the extent of and nature of this contact is disputed. According to Gilson, he tapped Grgic's elbow and asked her a question about where the individual being committed was to be taken. According to Grgic, Gilson placed his left arm around her waist and pulled her toward himself.

Grgic called the PSP and made a complaint on August 24, 2009. The PSP's Internal Affairs Division subsequently conducted an investigation, led by Sergeant Mark Noce. Sergeant Noce interviewed Grgic, Gilson, Sibbald, and others who were present at the scene of the incident. Noce interviewed Gilson twice and, before each interview, Noce read to Gilson a formal "Administrative Warning, which stated, among other things, "you are required to answer questions truthfully and completely or you may be subjected to administrative action." App. 1043. Gilson flatly, and repeatedly, denied having touched Grgic on her waist, maintaining that he had only touched her elbow. According to Noce, Grgic "described the touching as unwanted, inappropriate, and on a personal area of her body." App. 1003. Sergeant Noce determined that no one else had observed the incident between Gilson and Grgic, except Trooper Sibbald. Grgic's and

Sibbald's accounts of the incident differed only in that Sibbald stated that Grgic had quickly pushed herself away from Gilson, while Grgic said that she had walked away.

Sergeant Noce submitted a report of his investigation (the "IAD Report"), dated November 23, 2009, to Trooper Gilson's commanding officer, Captain Mark Schau. On December 8, 2009, Captain Schau issued a Summary Report to Trooper Gilson, which summarized the investigation, stated that he had determined that the allegation had merit and that he was considering taking disciplinary action against Gilson. The Summary Report informed Gilson that, pursuant to PSP procedures, he could request a meeting "for the purpose of offering any justification" or "mitigating information." App. 1063. A copy of the IAD Report was attached to the Summary Report.

Trooper Gilson's pre-disciplinary conference was held on December 11, 2009. Captain Schau was unable to attend and arranged for Operations Lieutenant Bradley Allen to meet with Trooper Gilson. Prior to the conference, Captain Schau had drafted a Disciplinary Action Report ("DAR"), which he instructed Lieutenant Allen to issue to Gilson if Gilson failed to "bring anything forward" at the conference. *See* App. 9. Lieutenant Allen issued the DAR to Gilson following the conference on December 11, having determined that Gilson had nothing additional to offer regarding his conduct. The DAR stated, among other things, "I have determined the allegation of Improper On-Duty Conduct against you is sustained. You were also found to be less than truthful during several administrative interviews conducted during this investigation." App. 1065.

Following a series of internal memoranda in which various PSP officials reviewed and analyzed the IAD Report, Sergeant Kyle Teter of the PSP Department Discipline

3

Office issued a Notice of Disciplinary Penalty to Gilson on November 9, 2010. The Notice stated that it was the Discipline Office's recommendation that he be terminated from the PSP. The Notice further indicated that Trooper Gilson's conduct was in violation of seven State Police Field Regulations, including regulations titled "Discrimination or Harassment," "Sexual Impropriety," and "Providing False Information." App. 1211. Thereafter, Trooper Gilson, who had until this point continued to perform his duties as usual, was suspended without pay. He initiated arbitration proceedings.

Following an arbitration hearing held on January 6, 2011, Arbitrator Steven M. Wolf issued an Opinion and Award in favor of the PSP on May 2, 2011. At the arbitration, the PSP framed the issue as whether Gilson had committed a "serious act of deception" during the investigation, while counsel for the Pennsylvania State Troopers Association ("PSTA"), appearing on behalf of Gilson, framed the issue as whether Gilson had violated the relevant Field Regulations. Under the terms of the collective bargaining agreement ("CBA") governing Gilson's employment relationship with the PSP, "the commission of a serious act of deception"[1] was an infraction for which "the proper level of discipline is termination of employment, notwithstanding any mitigating circumstances." App. 1225.

The arbitrator agreed with the PSP's framing of the issue, noting that the "serious act of deception" provision "is what the Commonwealth principally relies upon to

---

[1] Specifically, the CBA stated: "The commission of a serious act of deception during a criminal, civil or administrative investigation or proceeding, when under a specific, official obligation to be truthful, involving intentional (1) lying; (2) fabrication; (3) misleading acts or words; (4) civil or criminal fraud; or (5) perjury." App. 1225.

support its dismissal of [Gilson]." App. 1196. The arbitrator determined that Grgic's account of the incident was credible, and that Gilson's was not. He acknowledged the PSTA's argument that the term "serious act of deception" was ambiguous, but determined that it was "prudent to conclude that a State Trooper's conscious choice to fabricate testimony well over a dozen times during the course of an IAD investigation (most of those times being conclusive, but on occasion equivocating by not recalling) constitutes a 'serious act of deception.'" App. 1200. Accordingly, the arbitrator concluded that the PSP's decision to terminate Gilson's employment was supported by the CBA, and he upheld the decision.

On May 4, 2011, Major Lisa Christie, Department Discipline Officer, sent a memorandum to Captain Schau and Gilson. It summarized the events which led to Gilson's dismissal—which included a statement of the Field Regulations that Gilson was found to have violated—and indicated that the arbitration award had denied Gilson's grievance challenging the penalty of dismissal. In September 2011, this memorandum was forwarded by Debra Facciolo, the Director of the PSP's Human Resource Management Division, to the Pennsylvania Department of Labor and Industry, along with copies of the arbitrator's award and the November 2010 Notice of Disciplinary Penalty. Gilson claims that several prospective employers declined to offer him job offers after inquiring about him with the Department of Labor and Industry.

Gilson filed this action on January 6, 2012, bringing claims against the PSP, its Commissioner, Captain Schau, Sergeant Teter, Major Christie, Trooper Sibbald and Ms. Facciolo (collectively referred to herein as "the PSP Defendants"). As is relevant here,

5

Gilson claimed, under 42 U.S.C. § 1983, that the PSP Defendants deprived him of due process in violation of his federal constitutional rights because they failed to notify him that he had been accused of a "serious act of deception," because they failed to notify him that he had been charged with sexual harassment or sexual misconduct, and because the term "serious act of deception" was unconstitutionally vague. He also claimed that the PSP Defendants deprived him of his protected liberty interest in his reputation by publishing the May 4, 2011 Christie memorandum to the Pennsylvania Department of Labor and Industry, which caused state employers to refuse to hire him. Finally, Gilson claimed that the PSP subjected him to gender discrimination and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA").

On March 30, 2016, the District Court granted summary judgment in favor of the PSP Defendants on all counts. The Court concluded that Gilson had received adequate pre-deprivation and post-deprivation process, that he could not establish a claim for deprivation of his liberty interest in his reputation because the May 4, 2011 memorandum did not contain false information, that the "serious act of deception" language was not vague as applied, and that Gilson had failed to set forth sufficient evidence to withstand summary judgment on his claims of gender discrimination. This appeal followed.

II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over an order granting summary judgment, and summary judgment is proper when "the movant

6

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Mancini v. Northampton Cty.*, 836 F.3d 308, 313 (3d Cir. 2016). "If the non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law." *Mancini*, 836 F.3d at 313-14 (internal quotation marks omitted).

III.

Pursuant to 42 U.S.C. § 1983, an individual has a private right of action to redress the deprivation of a right secured by the United States Constitution, where the deprivation is committed by one acting under color of state law. *See* 42 U.S.C. § 1983; *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011). The Due Process Clause "prohibits a State from 'depriv[ing] any person of life, liberty, or property, without due process of law.'" *Mancini*, 836 F.3d at 315 (alteration in original) (quoting U.S. Const. amend. XIV, § 1).

A.    Due Process Claims

In *Schmidt v. Creedon*, we determined that (absent extraordinary circumstances) due process entitles an individual with a protected property interest in continued employment "to a pre-suspension or pre-termination hearing – albeit a brief and informal one." 639 F.3d 587, 596 (3d Cir. 2011). This is the case even when post-deprivation grievance procedures are adequate, after the fact, to provide redress for erroneously suspended employees. *Id*. at 597. This hearing, "though necessary, need not be

7

elaborate." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985); *see Schmidt*, 639 F.3d at 596. The employee is "entitled only to 'notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'" *Schmidt*, 639 F.3d at 596 (quoting *Loudermill*, 470 U.S. at 545).

For example, in *Gniotek v. City of Philadelphia*, 808 F.2d 241 (3d Cir. 1986), police officers were suspended after in-court testimony indicated that the officers had taken bribes. Prior to suspension, each officer was served with a notice, advised that he had been identified as the recipient of bribes in court testimony, and given a chance to make a statement. *Id*. at 242. We held that this notice comported with due process, because it was sufficient to "g[i]ve [the officer] notice of the charges and nature of the evidence against him," and was of sufficient specificity "to allow [the officer] the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges." *Id*. at 244.

Likewise, in *Copeland v. Philadelphia Police Department*, 840 F.2d 1139, 1142 (3d Cir. 1988), a police officer was informed that drug test results showed that he had used marijuana, and he was given an opportunity to explain the results. We determined that the officer's due process rights were not violated because the information provided "was sufficient to fulfill the due process requirement that he be apprised of 'the substance of relevant supporting evidence' against him." *Id*. at 1145 (quoting *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 265 (1987)). We also held that it was not violative of due process requirements for the city to inform the officer that it "intended to suspend him with intent to dismiss" only at the end of the meeting, or for the city to prepare formal

8

charges only after he had been dismissed. *Id.* at 1145-46. We observed that the formal charge was "based on the same information previously made available to [the officer], which he had the opportunity to refute," and that "[t]he fact that the specific charge was drafted after he had already been terminated does not constitute a violation of [the officer's] right to procedural due process under the present circumstances." *Id.*

In this case, the District Court correctly concluded that Gilson's constitutional right to procedural due process was not violated because, prior to depriving Gilson of his protected property interest in continued employment, the PSP provided him with all of the pre-deprivation process that was constitutionally required: notice of the allegations against him, an explanation of the evidence, "and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546; *Schmidt*, 639 F.3d at 596. At his interviews in connection with the investigation, Gilson was informed of the allegations against him, informed about what others had said in connection with the investigation, and provided with an opportunity to respond. On December 8, 2009, Gilson received the Summary Report, which included a copy of the full IAD Report, and he had the opportunity to present his own side of the story at the pre-disciplinary conference on December 11.

Gilson claims that the process was deficient because he was not adequately informed that he was being charged with lying during the investigation or that he would be accused of having committed a "serious act of deception." It is undisputed, however, that Gilson was warned that he was required to answer questions truthfully in connection with the investigation, and that he could be subject to administrative action for lying. In fact, before each of his interviews with Noce, Gilson signed a copy of this Administrative

9

Warning and checked a box affirming that he understood it. Also, the Summary Report made clear that the PSP considered the allegation against Gilson to have "merit," and, in this context, that necessarily meant that the PSP did not consider Gilson's version of events to be truthful. Gilson was on further notice that lying during the investigation could lead to his dismissal because the CBA, through a Special Order issued to all members of the PSP in 2005, specifically stated that termination was the proper discipline for lying "during . . . administrative investigation or proceeding." App. 721. Accordingly, at the pre-disciplinary conference on December 11, 2009, Gilson was aware that the PSP considered him to have lied during the investigation, he was aware of the statements of other witnesses contradicting his story, and he was given an opportunity to explain and respond.[2] In addition, immediately after the conference, and nearly a year before his suspension and eventual dismissal, Gilson received a copy of the DAR which stated that Gilson was "also found to be less than truthful during several administrative interviews conducted during this investigation. App. 1065. The requirements of due process were met.

Gilson further claims that the process was deficient because the Summary Report did not provide notice that the PSP considered his conduct to constitute harassment and sexual impropriety. Just as in *Copeland*, however, those formal charges were "based on

---

[2] Gilson argues that the "lack of specificity" with respect to explicit allegations of lying or a "serious act of deception," "did not allow [him] the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges." *See* Blue Br. at 34 (internal quotation marks omitted). It is unclear, however, what other facts Gilson could have presented in mitigation of or in denial of the charge of lying, that he did not already have the opportunity and incentive to bring forward at the pre-disciplinary conference. At that time, he had sufficient notice and opportunity to

10

the same information previously made available to [Gilson], which he had the opportunity to refute," *see* 840 F.2d at 1145-46, and Gilson acknowledges that he was fully informed of the relevant factual allegations. The fact that the formal charges were prepared only after the pre-deprivation conference does not signal a violation of due process. *See id.* The purpose of a pre-deprivation hearing is not to "definitively resolve" whether discipline is appropriate, or whether particular charges are appropriate given the facts, but instead is an "initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Schmidt*, 639 F.3d at 596-97 (quoting *Loudermill*, 470 U.S. at 545).

Because the PSP provided Gilson with the required notice and opportunity to be heard prior to his suspension, we will affirm the District Court's order rejecting Gilson's claims for deprivation of due process.[3]

B.      Liberty Interest in Reputation

Gilson contends that the PSP Defendants deprived him of his liberty interest in his reputation when they published Major Christie's May 4, 2011 memorandum to the

---

present whatever facts and evidence he had to support his version of events of August 17 (*i.e.*, to prove that he was not lying).

[3] Gilson does not argue that the post-deprivation grievance and arbitration procedures were insufficient to protect his right to due process, nor does he argue that they were not followed. Such a claim would, in any event, be unavailing. *See Dykes v. Se. Pa. Transp. Auth.*, 68 F.3d 1564, 1565 (3d Cir. 1995). Notably, Gilson failed to avail himself of the opportunity to appeal the arbitrator's decision in state court, *see Pa. State Police v. Pa. State Troopers Ass'n*, 656 A.2d 83, 89-90 (Pa. 1995) (describing the standard of review for grievance arbitration awards), and we have held that "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

11

Department of Labor and Industry, which thereafter provided it to potential employers. While "reputation *alone* is not an interest protected by the Due Process Clause," our Court has held that an employee may pursue a due process claim for deprivation of his liberty interest in his reputation "when an employer creates and disseminates a false and defamatory impression about the employee in connection with his termination[.]" *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (quotation marks omitted). To succeed on such a claim, the employee must establish "a stigma to his reputation *plus* deprivation of some additional right or interest." *Id*. To show "stigma," "it must be alleged that the purportedly stigmatizing statement(s) (1) were made publicly, and (2) were false." *Id*. (internal citations omitted).

The District Court correctly concluded that Gilson could not show "stigma," because the May 4, 2011 memorandum did not contain false statements. The memorandum accurately recounted the events that culminated in Gilson's ultimate dismissal, and accurately stated the Field Regulations on which Gilson's discipline was based. It did not make any representations regarding the exact findings of the arbitrator; it merely stated, correctly, that Gilson's grievance was denied following arbitration. Because the statements that Gilson contends were stigmatizing were not, in fact, false, the Court properly granted summary judgment on this claim to the PSP Defendants.

C.     Vagueness

Gilson also contends that the "serious act of deception" provision in the CBA is void for vagueness because he did not know its meaning, was not trained on its meaning, and was not made aware that repeated denials of an accusation could constitute a serious

12

act of deception. "In a void-for-vagueness challenge, we must ensure that a statute or standard is fair in that it is not so vague that a party would not know what conduct is prohibited." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 166-67 (3d Cir. 2008). A standard is unconstitutionally vague if its terms are "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). This inquiry is conducted "on a case-by-case basis, and the party opposing the statute or standard must show that it is vague as applied to him." *Borden*, 523 F.3d at 167.

In this case, the District Court properly concluded that the "serious act of deception" language was not unconstitutionally vague as applied to Gilson. Although Gilson correctly points out that reasonable minds could differ as to the meaning of "serious," the provision is not "so vague that a party would not know what conduct was prohibited." *See id.* at 166-67. The relevant paragraph of the CBA made clear that the provision is applicable to conduct that takes place "during a[n] . . . administrative investigation" when "under a specific, official obligation to be truthful" and when the conduct involves "intentional [] lying." App. 1225. This was sufficient to inform Gilson that intentionally (and repeatedly) lying, during interviews that were part of his official administrative investigation, was prohibited and could result in his dismissal without consideration of mitigating circumstances, as indicated in the CBA.

D.    Discrimination Claims

Gilson argues that he was targeted for discrimination based on his gender, in violation of Title VII and the PHRA. "Title VII makes it an 'unlawful employment practice for an employer . . . to discriminate against any individual . . . , because of such individual's race, color, religion, sex, or national origin.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting 42 U.S.C. § 2000e–2(a)(1)). We interpret claims under the PHRA "coextensively with Title VII claims." *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

Here, even assuming that Gilson could establish a prima facie case of gender discrimination (an issue seriously in doubt), the District Court properly granted summary judgment in favor of the PSP Defendants because the record is devoid of any evidence from which a factfinder could conclude that the PSP's legitimate, nondiscriminatory reason for Gilson's termination was pretext for gender discrimination. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Likewise, even if Gilson could show that he suffered intentional discrimination because of his sex, his hostile work environment claim fails because, as the District Court recognized, he failed to present sufficient evidence from which a factfinder could conclude that he suffered from discrimination that was "severe or pervasive." *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

IV.

We will affirm the order of the District Court granting summary judgment in favor of the PSP Defendants.

14