868 F.2d 74
 57 USLW 2498, 4 Indiv.Empl.Rts.Cas. 168
 FRATERNAL ORDER OF POLICE, LODGE NO. 5, Reginald Adams,
Willie Carroll, Bennie Noble, and George Smith, Appellants,
v.
Kevin M. TUCKER, individually and in his capacity as Police
Commissioner, City of Philadelphia, and the City
of Philadelphia.
 No. 88-1467.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 21, 1988.
Decided Feb. 17, 1989.
 
 Anthony J. Molloy, Jr. (argued), Robert B. Mozenter, Jane R. Goldberg, Mozenter, Molloy & Durst, Philadelphia, Pa., for appellants.
 Steven K. Ludwig (argued), Divisional Deputy City Sol., and Susan Shinkman, Asst. City Sol., Philadelphia, Pa., for Appellees.
 Before STAPLETON, SCIRICA and COWEN, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 This case arises from the City of Philadelphia Police Commissioner's decision to suspend with intent to dismiss four city police officers after they refused an order to submit to urinalysis. The officers sued the City and the Commissioner, alleging that the defendants violated their right to procedural due process under the fourteenth amendment, as well as their right under the fourth amendment to be free from unreasonable searches and seizures.
 
 
 2
 We agree with the district court that the defendants had a reasonable basis for suspecting that the officers were using drugs while on duty, and therefore will affirm the district court's grant of summary judgment in favor of the defendants on the fourth amendment claims. However, because the defendants did not provide the police officers with sufficient information concerning the evidence in possession of the department to permit a meaningful response to the charges against them, we will reverse the district court's judgment in favor of the defendants on the plaintiffs' procedural due process claims, and remand this case to the district court for further proceedings consistent with this opinion.
 
 I.
 
 3
 On February 26, 1986, the Philadelphia police department received an anonymous phone call from a "community leader of West Philadelphia" reporting that numerous residents in that area had observed police officers congregating and behaving unusually behind the tennis courts on the Cobb Creek Parkway at Catherine Street. The caller related that people were afraid of the officers, as they were apparently using drugs and were "acting crazy." App. at 133.
 
 
 4
 The department's Internal Affairs Division initiated an investigation and began surveilling the area the next day, February 27. After a period of observation ending March 17, the surveillance team determined that four particular officers were spending a substantial amount of time behind the tennis courts. These officers were identified as Reginald Adams, Willie Carroll, Bennie Noble, and George Smith.
 
 
 5
 Although the surveillance team was able to determine the identity of these officers, it was unable to get close enough to determine specifically what they were doing. On one occasion, the team did observe a small flash of fire, which burned for a few seconds. Upon returning to the site the next day, the team recovered from the ground a partially burned police report, a burned bottle cap, and a straw. The team also observed several instances of "reckless" and one instance of "bizarre" driving. App. at 136.
 
 
 6
 The recovered items were brought back to the Internal Affairs Division Headquarters in an attempt to determine whether they had been used to consume drugs. However, after a staff inspector contacted the Chief of the Police Department's Chemical Laboratory and was advised that the items would be "worthless as evidence," app. at 157, the items were discarded. Nevertheless, the Internal Affairs Division contacted officers in the narcotics unit, who advised that the items were consistent with the use of "crack." App. at 137-38.
 
 
 7
 On March 17, officers Adams, Carroll, Noble and Smith were asked to submit to urinalysis at police headquarters. When they refused, the Police Commissioner ordered them to submit to urinalysis. On the advice of their counsel, they refused this order.
 
 
 8
 The officers were then suspended without pay for 30 days pending dismissal (i.e., suspended with intent to dismiss). Additionally, the police department issued a press release, which included photographs of the officers, stating that the officers had been suspended for refusing an order to submit to urinalysis based on suspected drug use. Stories relating the contents of the press release, including photographs of the officers, were carried in newspapers and broadcast on television news shows.
 
 
 9
 On April 4, 1986, the officers were served with Notices of Intention to Dismiss. These formal notices charged the officers with refusing to submit to urinalysis, and also added the additional charge of falsifying logs and being off sector.[1] The officers had not been informed of the latter charges when they were suspended on March 17.
 
 
 10
 Pursuant to the collective bargaining agreement between the City and the police officers' union, the police officers filed a grievance on March 17 challenging their suspensions and dismissals. After the grievance was denied by the Police Commissioner, the matter was submitted to binding arbitration as provided in the collective bargaining agreement.
 
 
 11
 On September 12, 1986, the parties presented their arguments at a hearing before the arbitrator, and on January 27, 1987, the arbitrator issued an award. He sustained the grievance, ruling that the City had no authority under the collective bargaining agreement to order the officers to submit to urinalysis,[2] and that the officers had therefore been improperly dismissed for refusing the order. He did find, however, that a thirty day suspension for the other charges was appropriate. The arbitrator's decision was affirmed on appeal to the Court of Common Pleas, and that court's decision was affirmed by the Commonwealth Court.[3]
 
 
 12
 The officers and their union filed this action on March 12, 1987, alleging that the officers had been deprived of rights protected by the United States Constitution.[4] They claim that the defendants violated their fourth amendment right to be free from unreasonable searches when the defendants demanded that they submit to urinalysis. They also claim that the defendants violated their right to procedural due process when they were deprived of their property interests in their jobs and their liberty interests in their good names and reputations, without a meaningful opportunity to respond to the charges against them.
 
 
 13
 The district court granted the defendants summary judgment on the fourth amendment claims. After a trial, it entered judgment for the defendants on the claims alleging a deprivation of property and liberty without due process of law. The plaintiffs appeal from these dispositions.
 
 II.
 A. Unreasonable Search and Seizure
 
 14
 The plaintiffs assert that the investigation conducted by the department did not give rise to a reasonable suspicion of drug use, and thus did not meet the standard established by this Court in Copeland v. Philadelphia Police Dep't, 840 F.2d 1139 (3d Cir.1988). We agree that the Copeland standard applies in this case, as the urinalysis was not conducted pursuant to a random drug urinalysis program of the type we have approved in Shoemaker v. Handel, 795 F.2d 1136 (3d Cir.1986), cert. denied, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986), and Policeman's Benevolent Ass'n of New Jersey v. Township of Washington, 850 F.2d 133 (3d Cir.1988). As we held in Copeland, the appropriate standard is "whether the department had a reasonable suspicion that [a particular officer] was a user of illegal drugs." 840 F.2d at 1143. This standard requires "an objective evaluation of whether reasonable suspicion existed." Id. at 1144. Factors important to such an evaluation include: "(1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof." Id. (quoting from Security & Law Enforcement Employees, Dist. Council 82 v. Carey, 737 F.2d 187, 205 (2d Cir.1984)).
 
 
 15
 Applying these factors to the present case, we hold that the plaintiffs' Fourth Amendment rights were not violated by their discharge because the Internal Affairs officers had a reasonable suspicion of on-duty drug use to support the urinalysis order. The complaint that precipitated the investigation (1) came from an apparently reliable source, (2) included detailed accounts of observations made by a number of different people on a number of different occasions, and (3) was corroborated in important respects by subsequent surveillance of the scene by the Internal Affairs Officers. As the district court found:
 
 
 16
 ... [T]he police received a telephone call from a community leader who wished to remain anonymous on February 26, 1986. The caller said that residents of the Cobb Creek Park area complained that police officers drive their patrol cars into the Cobbs Creek Park both in the early morning and early evening hours. One anonymous female resident stated that police drive their cars onto the grass behind the tennis courts and use drugs. An anonymous male resident stated that he saw a police car sitting behind the tennis courts while he was walking his dog in the early morning hours. The resident said that a small fire was burning beside the driver's door of the car. As the resident approached, the police officer began to drive off. The police officer then backed up at a high rate of speed and stopped. The officer drove back to the fire, stamped it out and then drove off at a high rate of speed.
 
 
 17
 The subsequent surveillance corroborated that the plaintiffs were congregating behind the Cobb Creek Park tennis courts on a regular basis with their car lights turned off, that plaintiffs engaged in fast and erratic driving, and that plaintiffs caused a "brief flash of fire" at a location where paraphernalia used in the making of "crack" was subsequently discovered. This evidence was clearly enough to justify the urinalysis order and, accordingly, warranted summary judgment for the defendants on the Fourth Amendment claim.
 
 
 18
 B. Deprivation of Property Without Due Process
 
 
 19
 After trial, the district court made the following findings concerning the process afforded plaintiffs on the morning of March 17, 1986:
 
 
 20
 1. On the morning of March 17, 1986, each of the plaintiffs, Philadelphia police officers, was taken to the Internal Affairs Division of the Philadelphia Police Department. Upon arriving at the Internal Affairs Division, they were told that there was a complaint of drug use involving police officers; however, they were not told anything specific about the drug use allegations being investigated or the evidence regarding this drug use allegation.
 
 
 21
 2. Plaintiffs were told that they would be asked questions regarding their on-duty performance and would be asked to substantiate their activities at certain times and places, however, plaintiffs were never asked any questions regarding the performance of their duties.
 
 
 22
 3. Plaintiffs were told that they would be requested to submit to a urinalysis examination. When told that they would be requested to submit to a urinalysis, plaintiffs asked for the presence of their Fraternal Order of Police (FOP) representative. Plaintiffs were notified individually that the order to submit the urine sample had come directly from defendant Police Commissioner, Kevin M. Tucker. They were warned that disobedience would be disciplined with measures up to and including dismissal.
 
 
 23
 4. Plaintiffs, acting upon the advice of counsel and their FOP representative, refused the urinalysis request and order given by Captain Kerrigan.
 
 
 24
 With respect to plaintiffs' opportunity to tell their side of the story prior to the suspensions with intent to dismiss and prior to the press release, the district court also found as follows:
 
 
 25
 Plaintiffs' opportunity to respond to the order that they submit to urinalysis tests was manifested in their refusal to do so on advice of counsel. They were discharged for refusing that order. Having chosen to respond in this manner, plaintiffs cannot claim lack of opportunity to respond to the
 
 
 26
 Plaintiffs in the case at bar had an opportunity to respond to the information released ... prior to its release at the time the urinalysis was requested....
 
 
 27
 As we read the district court's opinion, it found that plaintiffs were warned when the urinalysis was ordered that disobedience could result in discipline, that they thereafter had an opportunity, with the assistance of counsel, to state any objections, and that their only response was to refuse to obey the order.
 
 
 28
 These findings are not clearly erroneous. The record reflects a substantial amount of conversation between plaintiffs' counsel and Captain Kerrigan, Commissioner Tucker's surrogate on the spot, at the time the urinalysis was first requested of plaintiffs and then ordered. A permissible inference from this evidence was that plaintiffs and their counsel could have protested the validity of the order when it was given and could have otherwise objected to the threatened discipline, but declined to do so. Indeed, the record affirmatively suggests that counsel expected temporary suspensions, rather than discharges, and was planning to raise the validity of the order when those suspensions or other lesser discipline were grieved and arbitrated.
 
 
 29
 The defendants concede that the plaintiffs have cognizable property interests in their positions as police officers that are sufficient to trigger the procedural due process protection of the Fourteenth Amendment. See Copeland, 840 F.2d at 1144 (Philadelphia police officers have a cognizable property interest in their jobs); Gniotek v. City of Philadelphia, 808 F.2d 241, 243 (3d Cir.1986) cert. denied, 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987) (same). The issue before us, then, is whether the process afforded the officers meets the fourteenth amendment standard.
 
 
 30
 In Cleveland Board of Educ. v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme court held that a public employee with a property interest in his or her job is entitled to a "pretermination opportunity to respond, coupled with post-termination administrative procedures." Id. at 547-8, 105 S.Ct. at 1496. In particular, a "tenured public employee is entitled to [pretermination process consisting of] oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id. at 546, 105 S.Ct. at 1495. The pretermination hearing may be informal so long as it affords the employee an opportunity to make any "plausible arguments that might ... prevent [the] discharge." Id. at 544, 105 S.Ct. at 1494.
 
 
 31
 In Gniotek v. City of Philadelphia, 808 F.2d 241 (3d Cir.1986), cert. denied, 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987), six officers were "suspended with intent to dismiss," an action which we held to be tantamount to dismissal. 808 F.2d at 244 ("[W]e hold that before appellants were suspended with intent to dismiss they were entitled to whatever pretermination procedures the Constitution mandates prior to actual dismissal"). Applying Loudermill, we found that the predeprivation procedure employed in that case, in which each officer was individually called into the Inspector's office, informed of the charges against him, and given an opportunity to make a statement, was constitutionally adequate. Id. at 244-46.
 
 
 32
 Similarly, in Copeland v. Philadelphia Police Dep't, 840 F.2d 1139 (3d Cir.1988), we again noted the constitutional requirement that a city provide an officer with notice and an opportunity to be heard prior to terminating his employment. Since the officer in that case had been orally informed of the charges against him, had been advised of "the substance of the relevant supporting evidence," and had been given an opportunity to explain such evidence at an informal pretermination hearing, we held that his right to procedural due process had not been violated. 840 F.2d at 1145 (quoting Brock v. Roadway Express, Inc., 481 U.S. 252, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987)).
 
 
 33
 In this case, the plaintiffs were orally informed on March 17 that they were to be disciplined for refusing the Commissioner's order to submit to urinalysis. The district court found that the officers and their counsel were given the opportunity to state any objections they might have to the proposed discipline.[5] Under Gniotek, we think this process was sufficient with respect to any plausible arguments the plaintiffs were in a position to make at that time, including the argument, ultimately sustained by the arbitrator, that the order was invalid. This does not end the inquiry, however.
 
 
 34
 In Loudermill, the Supreme Court held that a public employee who, like the plaintiffs here, has a property interest in his or her employment is entitled to a meaningful pre-termination hearing. It further held that a sina qua non of a meaningful hearing is a sufficient explanation of the employer's evidence to permit a meaningful response. The district court here found as a fact that the plaintiffs were advised "that there was a complaint of drug use involving police officers" but that "they were not told anything specific about the drug use allegations being investigated or the evidence regarding this drug use allegation." Without this information plaintiffs and their attorneys, even assuming they were afforded the opportunity to tell plaintiffs' side of the story, had no opportunity to explain or rebut the evidence giving rise to the "reasonable suspicion" of on-duty drug use. We hold that the failure to afford plaintiffs such an opportunity prior to the deprivation of their property interests in their jobs constituted a denial of their right to procedural due process.
 
 
 35
 In reaching this conclusion, we do not question the finding of the district court that plaintiffs were discharged for failing to obey the urinalysis order, rather than for on-duty drug use per se. This fact does not render a fundamentally unfair process fair, however; nor does it suggest that a hearing would have been pointless. We have elsewhere noted the substantial intrusion on privacy interests occasioned by compelled urinalysis. See, e.g., Shoemaker v. Handel, 795 F.2d 1136 (3d Cir.1986), cert. denied, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). In a situation of this kind, there are many reasons other than guilt of on-duty drug use for an officer to be reluctant to accede to an order to submit to urinalysis. This is important because the defendants do not contend that refusal to obey an order, even one to submit to urinalysis, necessitates a discharge under departmental policy. The appropriate discipline depends on all of the surrounding circumstances and one of the more important of these would be whether the facts giving rise to the "reasonable suspicions" have been explained in a manner consistent with innocence. We decline to assume that Commissioner Tucker would be sufficiently insensitive to the privacy interests involved in compelled urinalysis that he would insist on discharges for plaintiffs' refusal to obey the urinalysis order even if he were otherwise satisfied that there had been no on-duty drug use.
 
 
 36
 We have held that the City's interest in a drug free police force justifies the intrusion of compelled urinalysis whenever there is a basis for a reasonable suspicion of drug use. Copeland, 840 F.2d at 1143-44. That relatively low standard will be met in many instances in which the suspicion does not correspond with reality. In such instances, the opportunity to explain the misleading appearances before a dismissal and the attendant publicity will be of great importance to both the officer involved and, ultimately, to the Department.[6]
 
 
 37
 It follows that the judgment of the district court must be vacated and the case remanded. On remand, the district court should first determine whether the parties implicitly understood that the issues of liability and damages had been bifurcated for the purpose of trial. The record reflects no such bifurcation, but the fact that no evidence of damages was tendered at trial suggests to us that there may have been an off-the-record understanding with respect to this matter.
 
 
 38
 If there was no bifurcation, the case must be decided on the current record. Accordingly, the district court should enter a declaratory judgment stating that plaintiffs' right to procedural due process was violated and enter a damage judgment in plaintiffs' favor in the amount of $1.00. See Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (where record contains no evidence of actual damages, students denied procedural due process prior to suspensions from school are entitled to recover nominal damages, not to exceed one dollar). Since plaintiffs do not ask for a belated Roth hearing,[7] the district court can do no more by way of relief.[8]
 
 
 39
 If, on the other hand, there was a bifurcation, another trial should be held to afford plaintiffs an opportunity to prove damages that are causally related to the due process violation. In connection with their prayers for compensatory damages occasioned by their discharge, the district court will have to determine whether plaintiffs would have been discharged even if they had been informed of facts giving rise to the reasonable suspicion and had been given an opportunity to explain or refute those facts. There can be no relief with respect to compensatory damages for injuries occasioned by the alleged deprivations (i.e., the dismissals and the press release) unless it is determined that, with such an opportunity, the result would have been different.[9] See, e.g., Carey v. Piphus, 435 U.S. at 260, 98 S.Ct. at 1050; Rodriguez de Quinonez v. Perez, 596 F.2d 486, 491 (1st Cir.1979), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979).
 
 
 40
 If there was a bifurcation, plaintiffs should also be given the opportunity to prove that as a proximate result of the failure to afford an opportunity to explain or rebut the reasonable suspicion, they suffered emotional distress and injury to their reputations. If the district court determines that such an opportunity would have resulted in no discharge and no press release, we perceive no reason why the damage occasioned by the press release should not be recoverable whether or not there is an independent, meritorious claim for deprivation of a liberty interest without due process of law. See, e.g., Marrero v. City of Hialeah, 625 F.2d 499, 514 (5th Cir.1980), cert. denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981) (where there is no deprivation of a liberty interest, plaintiffs may nevertheless recover for damages to their reputational interests occasioned by the denial of an independently secured contitutional right); see also Hinkle v. Christensen, 733 F.2d 74, 76 (8th Cir.1984) (compensatory damages for injury to reputation recoverable for violation of First Amendment rights).
 
 
 41
 C. Deprivation Of Liberty Without Due Process Of Law
 
 
 42
 On remand, the district court need not concern itself with plaintiffs' claim that they were deprived of a liberty interest without due process of law. Defendants are entitled to judgment on that claim.
 
 
 43
 In Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), a probationary policeman had been dismissed without a hearing "because while still a trainee he had put a revolver to his head in an apparent suicide attempt." 429 U.S. at 626, 97 S.Ct. at 883. The officer brought a civil rights action claiming that he had been deprived of a liberty interest without due process of law when the defendants "imposed a stigma ... that foreclosed his freedom to take advantage of other employment opportunities." 429 U.S. at 625, 97 S.Ct. at 883. Like the plaintiffs in this case, he sought reinstatement and damages resulting from the denial of a predeprivation hearing but did not ask for a delayed hearing before the Department at which he would have the opportunity to refute the charge in question.
 
 
 44
 The Supreme Court held that "[a]ssuming all of the other elements necessary to make out a claim of stigmatization under Roth and Bishop," 429 U.S. at 627, 97 S.Ct. at 884,[10] the plaintiff had failed to prove a final necessary element. "Nowhere in his pleadings or elsewhere [had the plaintiff] affirmatively asserted that the report of the apparent suicide attempt was substantially false [, and neither] the District Court nor the Court of Appeals [had] made any such finding." Id. The Supreme Court held that given "the nature of the interest sought to be protected [by the constraints of the Due Process Clause on liberty deprivation], the absence of any such allegation or finding [was] fatal to [plaintiff's] claim under the Due Process Clause that he should have been given a hearing." Id.
 
 
 45
 In this case, as in Codd, there is neither a finding nor evidence at trial to support a finding that the press release was false or even misleading. Accordingly, it follows from Codd that plaintiffs failed to prove their liberty interest claim.
 
 
 46
 The press release reported that plaintiffs had been discharged for refusing to obey an order to submit to urinalysis based on suspected drug use. Plaintiffs' complaint alleged the following with respect to this release:
 
 
 47
 The publication of names and pictures of Plaintiffs Adams, Carroll, Noble and Smith via press releases and media interviews in conjunction with unconfirmed and unsubstantiated allegations of drug use and their discharge for refusing a urinalysis has subjected Plaintiffs Adams, Carroll, Noble and Smith to public humiliation and degradation, affecting their standings in the community, depriving them of their liberty interest in their reputations in violation of their Fifth and Fourteenth Amendments of the Constitution of the United States and Article I of the Pennsylvania Constitution.
 
 
 48
 App. at 19. Thus, plaintiffs allege only that their names and picture were circulated in conjunction with "unconfirmed and unsubstantiated" allegations of drug use.
 
 
 49
 If there is stigmatization in a situation of this kind it comes not from the report of a suspicion, reasonable or otherwise, but from the overall message communicated by the release. See, e.g., Rodriguez de Quinonez v. Perez, 596 F.2d 486, 490 (1st Cir.1979), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979) ("It is true that, strictly read, the statute [under which the plaintiff was removed from office] does not require an official determination or charge of dishonesty, but only a finding that there is sufficient 'evidence' of dishonesty to warrant invoking the statute. This superfine distinction would have little practical effect, however, in reducing the clear imputation of dishonesty flowing from removal under this statute.").
 
 
 50
 When a police department announces to the media that it has information sufficient to occasion an investigation of on-duty drug use, that in this context the officer under investigation refused urinalysis, and that the Department considered the overall situation such as to warrant dismissal, other law enforcement agencies are unlikely to consider the officer for other employment because, at least without more information than that reported, they will conclude that the officer is more likely than not guilty as charged. Accordingly, if the plaintiffs had alleged and proved in this case that they had not used drugs behind the Cobb Creek Park tennis courts or that they had substantial evidence to tender at a hearing in support of such an allegation, they, at least arguably, would have made out a stigmatization case under the Due Process Clause. However, as indicated by the above-quoted allegation from their complaint, plaintiffs claim only that the defendant's allegations were "unconfirmed and unsubstantiated," not that they were untrue. The fact that this was no oversight is evidenced by their failure to tender any evidence at trial that would support a finding that they were falsely accused and by their failure to request an administrative hearing at which to offer evidence to clear their names.[11]
 
 III.
 
 51
 Accordingly, we will reverse the judgment of the district court and remand for further proceedings consistent with this opinion solely on plaintiffs' claims that they were deprived of their property interest in their jobs without procedural due process.
 
 
 52
 COWEN, Circuit Judge, concurring in part and dissenting in part.
 
 I.
 
 53
 I agree with the majority that the defendants had evidence sufficient to establish a reasonable suspicion that the plaintiff officers were using drugs, and that the defendants therefore did not violate the plaintiffs' rights under the fourth amendment when they ordered the plaintiffs to submit to urinalysis. I also agree with the majority's conclusion that the defendants violated the plaintiffs' right to procedural due process when they did not inform the plaintiffs of the evidence giving rise to a reasonable suspicion that the officers had used drugs before they were discharged. I thus concur with the majority's reasoning and conclusions as they relate to these two issues.
 
 
 54
 I write separately, however, for two reasons. First, I believe that the majority's opinion is seriously flawed in several important respects relating to the plaintiffs' claim that they were denied their property interests in their jobs in violation of their constitutional right to procedural due process. Essentially, it is my opinion that the defendants not only wrongfully withheld information regarding the charges from the plaintiffs, but also did not accord the plaintiffs a clear and adequate opportunity to respond to the charges against them. The majority errs when it concludes that the plaintiffs did have a constitutionally adequate opportunity to respond.
 
 
 55
 Second, I disagree with the majority's conclusion that the plaintiffs' failed to prove their claim that they were denied their liberty interest in their good names and reputations without due process. Majority at 83. Specifically, the majority errs when it concludes that the plaintiffs did not present evidence to support a finding that the press release issued by the defendants was false and defamatory. To the contrary, the press release clearly communicated the impression that the plaintiffs had been discharged for wrongfully disobeying an order to submit to urinalysis, and the fact that an arbitrator has since ruled that the plaintiffs had a contractual right to refuse that order demonstrates that the impression that the plaintiffs' action was wrongful is false.
 
 II.
 
 56
 The Supreme Court has held that a public employee with a property interest in his job is entitled to a "pretermination opportunity to respond, coupled with post-termination administrative procedures." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 547-48, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985). While the pretermination hearing need not be formal, it must furnish the employee notice and an opportunity to respond. Id. at 546, 105 S.Ct. at 1495. "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id. The Court noted that "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." Id.
 
 
 57
 This fundamental due process requirement was denied the plaintiffs in this case. After the plaintiffs were informed of the order to submit to urinalysis, they were asked whether they intended to comply with the order. Through counsel, they indicated that they did not intend to comply. The plaintiffs were then immediately dismissed on the charge of refusing the order to submit to urinalysis. They were given no opportunity, following their refusal of the order, to present reasons why their refusal should not result in dismissal.
 
 
 58
 The majority opinion purports to review factual findings by the district court that the plaintiffs were given such an opportunity, and determine that those factual findings were not clearly erroneous. The district court, however, made no such factual findings, notwithstanding the illusion created by the majority's selective quotation of the district court's opinion. Moreover, if such findings were made, I think it is clear that based on the record before us, those findings would be clearly erroneous.[1]
 
 
 59
 After trial, the district court made the following relevant "Findings of Fact":
 
 
 60
 1. On the morning of March 17, 1986, each of the plaintiffs, Philadelphia police officers, was taken to the Internal Affairs Division of the Philadelphia Police Department. Upon arriving at the Internal Affairs Division, they were told that there was a complaint of drug use involving police officers; however, they were not told anything specific about the drug use allegations being investigated or the evidence regarding this drug use allegation.
 
 
 61
 2. Plaintiffs were told that they would be asked questions regarding their on-duty performance and would be asked to substantiate their activities at certain times and places; however, plaintiffs were never asked any questions regarding the performance of their duties.
 
 
 62
 3. Plaintiffs were told that they would be requested to submit to a urinalysis examination. When told that they would be requested to submit to a urinalysis, plaintiffs asked for the presence of their Fraternal Order of Police (FOP) representative. Plaintiffs were notified individually that the order to submit the urine sample had come directly from defendant Police Commissioner, Kevin M. Tucker. They were warned that disobedience would be disciplined with measures up to and including dismissal.
 
 
 63
 4. Plaintiffs, acting upon the advice of counsel and their FOP representative, refused the urinalysis request and order given by Captain Kerrigan.
 
 
 64
 5. After refusing the urinalysis, plaintiffs were discharged on March 17, 1986 for this refusal by being served with a notice of suspension for thirty (30) days with intention to dismiss upon orders of the Philadelphia Police
 
 
 65
 10. On the date of plaintiffs' suspensions, March 17, 1986, the police department issued a press release stating that the plaintiffs were fired for refusing a urinalysis order based on suspicion of drug use and, further, released photographs of all plaintiffs from their personnel records for publication. These photographs were in fact published by the media.
 
 
 66
 App. at 350-53.
 
 
 67
 Utilizing these "Findings of Fact," the district court reached the following relevant "Conclusions of Law":
 
 
 68
 1. It seems abundantly clear, and the parties agree, that plaintiffs have a cognizable property interest in continued employment with the Philadelphia Police Department. Copeland v. The Philadelphia Police Department, 840 F.2d 1139, 1144 (3rd Cir.1988); Gniotek v. City of Philadelphia, 808 F.2d 241, 243 (3rd Cir.1986).
 
 
 69
 2. Consequently, plaintiffs are entitled to notice and an opportunity to be heard prior to suspension with the intent to dismiss, which is actually a "de facto" dismissal. Copeland, 840 F.2d at 1144; Gniotek, 808 F.2d at 243.
 
 
 70
 3. Due process can be satisfied by oral notice. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985); Copeland, 840 F.2d at 1145. Notice is sufficient if it (1) apprises the vulnerable party of the nature of the charges and general evidence against him, and (2) if it is timely under the particular circumstances of the case. Gniotek, 808 F.2d at 244.
 
 
 71
 4. Plaintiffs were given sufficient notice and opportunity to be heard prior to their suspension with the intent to dismiss. Plaintiffs were told that there was a complaint of drug use involving police officers and that they would be asked questions about their on-duty performance. Plaintiffs were also told that they would be requested to submit to a urinalysis and that disobedience would be disciplined with measures up to and including dismissal. With this information in mind, upon the advice of counsel, plaintiffs refused to submit to the urinalysis. Plaintiffs were then suspended with the intent to dismiss for this act of insubordination. Plaintiffs' opportunity to respond to the order that they submit to urinalysis tests was manifested in their refusal to do so on advice of counsel. They were discharged for refusing that order. Having chosen to respond in this manner, plaintiffs cannot claim lack of opportunity to respond to the charges.....
 
 
 72
 6. Turning next to plaintiffs' liberty interest, plaintiffs have a protected liberty interest since potentially "stigmatizing" information was released to the public. Anderson v. The City of Philadelphia, 845 F.2d 1216 (3rd Cir.1988); Perri v. Aytech [sic], 724 F.2d 362 (3d Cir.1983).
 
 
 73
 7. Where a liberty interest, such as a person's good name, reputation, honor or integrity is at state [sic] because of government action, notice and an opportunity to be heard are essential. Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); Perri, 724 F.2d at 367. This procedure would allow an individual to refute any charges made and to clear his or her name. Id.
 
 
 74
 8. Plaintiffs in the case at bar had an opportunity to respond to the information released both prior to its release at the time the urinalysis was requested and particularly after the information's release in their hearing before an arbitrator as provided for under the plaintiffs' collective bargaining agreement. Although the police department's release of the information did not demonstrate the best judgment, it did not rise to a constitutional violation.
 
 
 75
 App. at 353-55 (footnote omitted).
 
 
 76
 The majority quotes selected portions of the district court opinion (without indicating whether those portions were denominated "Findings of Fact" or "Conclusions of Law" by the district court), and states the following:
 
 
 77
 As we read the district court's opinion, it found that plaintiffs were warned when the urinalysis was ordered that disobedience could result in discipline, that they thereafter had an opportunity, with the assistance of counsel, to state any objections, and that their only response was to refuse to obey the order.
 
 
 78
 These findings are not clearly erroneous.
 
 
 79
 Majority at 79.
 
 
 80
 By reviewing all of the district court's "findings" for clear error, the majority erroneously transforms the legal conclusions of the district court into findings of fact. The district court carefully and properly followed Fed.R.Civ.P. 52(a), which requires that in all actions tried without a jury, "the court shall find the facts specially and state separately its conclusions of law thereon." As I read the district court's opinion, it found as fact that the plaintiffs were ordered to submit to urinalysis, and that they refused this order on the advice of counsel. The district court then concluded, as a matter of law, that this opportunity to comply with or refuse the urinalysis order was, in the context of this case, a constitutionally adequate opportunity to respond.
 
 
 81
 The problem with the district court's analysis is that it does not address the fact that the officers were given no opportunity to respond to the charge that they should be dismissed for refusing to submit to urinalysis.[2] There is a significant difference between responding "no" to an order to submit to urinalysis and responding to a charge that one's refusal to submit to urinalysis is a sufficient basis to warrant dismissal from one's job. Since the plaintiffs were not given an opportunity to respond to the charges against them, they were denied procedural due process. By mischaracterizing the district court's opinion, the majority avoids confronting this critical legal issue. Thus, while I concur with the majority's conclusion that the plaintiffs were denied their constitutional right to procedural due process, I do not sanction its treatment of this issue.
 
 III.
 
 82
 I also believe that the majority has erred in concluding that the plaintiffs did not prove their claim that they were deprived of a liberty interest without due process. I dissent from that part of the majority's opinion which affirms the district court order dismissing this claim.
 
 
 83
 The plaintiffs contend that they were denied procedural due process when the department issued a press release to the media describing their de facto discharge for refusing to submit to urinalysis based on suspicion of drug use before affording them an opportunity to respond to the content of that statement. We have held that procedural guarantees attach in connection with a public employee's termination if either
 
 
 84
 charges are made that "might seriously damage his standing and associations in his community," or if the state in dismissing the employee "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." An employee is entitled to a hearing, however, "[o]nly if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination...."
 
 
 85
 Perri v. Aytch, 724 F.2d 362, 367 (3d Cir.1983) (quoting Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) and Codd v. Velger, 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977)) (citations omitted).
 
 
 86
 The press release issued in this case contained statements that satisfied both of the preliminary criteria. A news report indicating that a police officer has been suspended for refusing an order to submit to urinalysis when suspected of drug use both damages the officer's standing and associations in his community, and imposes a stigma that would limit his future employment opportunities.
 
 
 87
 The press release also meets the second requirement, namely that it create a "false and defamatory impression about the employee in connection with his termination." Perri, 724 F.2d at 367 (quoting Codd v. Velger, 429 U.S. at 628, 97 S.Ct. at 884). The defamatory and false impression created in this case is the impression that the officers had done something wrong--so wrong that it was necessary they be dismissed--when they refused the Commissioner's order to submit to urinalysis.[3] An arbitrator has determined that the officers should not have been discharged when they refused the order to submit to urinalysis, because the department did not have the legal authority to issue such an order. Thus, the impression that the officers had committed a dischargeable offense was false, and given the nature of the impression, defamatory.
 
 
 88
 The only issue remaining, then, is whether the officers received adequate due process in connection with the issuance of the press release. The department argues that the grievance/arbitration procedure provided the officers sufficient due process. The law requires that an employee be afforded "notice and hearing ... to provide the person an opportunity to clear his name." Roth, 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12.
 
 
 89
 The timing and type of hearing required in these circumstances is discussed at some length in Justice Stevens' dissenting opinion in Codd v. Velger. Justice Stevens notes that Roth "plainly states" that before depriving a person of a liberty interest of this type, it must grant him a "full prior hearing." Codd, 429 U.S. at 633, 97 S.Ct. at 887 (quoting Roth, 408 U.S. at 574, 92 S.Ct. at 2707). In a footnote, he further explains that Roth distinguishes between the two different types of liberty interests which may be implicated when a public employee is discharged. 429 U.S. at 633 n. 3, 97 S.Ct. at 887 n. 3. If a person's reputation interest is at stake, he writes, Roth does not tell us whether a hearing is required before the deprivation. But where the individual's interest is in avoiding a "stigma or other disability" that forecloses future employment opportunities, Roth "rather clearly indicates that no such stigma may be imposed without a 'full prior hearing.' " Id. (citation omitted); see also Roth, 408 U.S. at 572-75, 92 S.Ct. at 2706-08.
 
 
 90
 I agree with Justice Stevens' reading of Roth. Since the officers in this case had an interest in avoiding a "stigma or other disability," they were entitled to a full prior hearing before the department issued its press release. In fact, the officers were not even given an informal opportunity to respond to the department's charges before the department issued the press release. I would therefore reverse the district court order dismissing this claim and instruct the district court, on remand, to enter judgment in favor of the officers on the issue of liability.
 
 
 
 [1]
 The officers had been first notified of these additional charges on April 3, when they were served with departmental charges alleging these violations
 
 
 [2]
 Specifically, the arbitrator reasoned that since the collective bargaining agreement neither authorized nor prohibited drug testing, he had to look to the Philadelphia Home Rule Charter and Civil Service regulations, which are incorporated by reference into the agreement, to determine whether the City had the authority to discharge an officer for refusing an order to submit to urinalysis. He concluded that the order to submit to urinalysis was unlawful in light of the lack of a rule authorizing urinalysis as an information gathering procedure
 
 
 [3]
 The City has filed a petition for allocatur with the Pennsylvania Supreme Court
 
 
 [4]
 The plaintiffs also contended that they were deprived of rights protected by the Pennsylvania Constitution, but they have not pursued those contentions on appeal
 
 
 [5]
 As we concluded in Copeland, the due process clause can be satisfied by oral notice. 840 F.2d at 1145. The officers do, however, contend that their due process rights were violated when they were not given notice of the charges that they had falsified logs and were off sector before they were effectively discharged. As we read the record, however, the department had not yet formulated these charges when it effectively dismissed the officers on March 17. The officers were discharged on March 17 because they refused the order to submit to urinalysis. When these additional charges were formulated, the officers were given an opportunity to respond to them before any additional sanction was imposed. We see no violation of procedural due process in this procedure
 
 
 [6]
 We emphasize that it is not necessary to reveal to the officer during an investigation the facts giving rise to the reasonable suspicions; nor does due process require even an informal notice and hearing prior to an order that he or she submit to urinalysis. We hold only that a meaningful opportunity to be heard on the underlying charge is required before the officer can be deprived of his or her employment
 
 
 [7]
 See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)
 
 
 [8]
 If the arbitrator's award should be overturned by the Pennsylvania Supreme Court, the district court also would be required to consider whether plaintiffs' prayer for reinstatement should be granted
 
 
 [9]
 The defendants should be allocated the burden of proving that plaintiffs would have been discharged even if adequate notice had been given to them. Alexander v. Polk, 750 F.2d 250, 264 (3d Cir.1984). In some cases, plaintiffs may be able to recover for proven mental and emotional distress occasioned by the failure to afford due process per se even though the deprivation itself was justified. Carey v. Piphus, 435 U.S. at 263-64, 98 S.Ct. at 1052; Rodriguez de Quinonez v. Perez, 596 F.2d 486, 491 n. 5 (1st Cir.1979), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979). We do not rule out the possibility that plaintiffs may be able to create a record which would support such a recovery
 
 
 [10]
 See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)
 
 
 [11]
 At trial, the parties stipulated that, if called, the witnesses in the arbitration proceeding would give the same testimony they gave before the arbitrator. It was only in this manner that testimony from the plaintiffs became a part of the record in this case. Before the arbitrator, none of the plaintiffs denied on-duty drug use. Indeed, they were not asked about the matter. The closest there is to a denial is plaintiff Smith's testimony that an officer might be behind the tennis courts with his lights off for reasons other than drug consumption, app. at 277, and plaintiff Noble's testimony that he had been behind the tennis courts on occasion to do some paperwork and relax. App. at 291
 
 
 [1]
 No witness testified that the plaintiffs were given an opportunity to be heard, and several witnesses testified that the plaintiffs were discharged immediately after they refused the urinalysis order, without having been offered an opportunity to respond to the insubordination charge. See, e.g., app. at 179 (police captain testified that he informed officers of suspension immediately after they refused order, and did not mention giving anyone an opportunity to make a statement); app. at 314 (testimony by officer that plaintiffs were suspended immediately after refusing order); app. at 325-26 (testimony by officer that he refused urinalysis order, and that nothing was said to him after his refusal until he was suspended with intent to dismiss); see also app. at 38 (stipulation that suspensions for insubordination were "on the spot")
 
 
 [2]
 In fact, the officers later successfully contended that they had a legal right to refuse to submit to urinalysis
 
 
 [3]
 I would distinguish this impression from the impression the press release would also create that the officers were drug users. The truth or falsity of the impression that the officers were drug users is, as the majority argues, not an issue that can be determined on the basis of the record before the Court. The majority errs, however, when it concludes that the record before us does not establish that the press release was false and defamatory. The arbitrator's decision, which is binding on these parties, establishes that the officers had a legal right to refuse the urinalysis order, and that their refusal of this order was an improper ground for termination. The impression created by the press release that the officers had wrongfully refused the urinalysis order and that they had committed a dischargeable offense was therefore false. The arbitrator's opinion, as well as a judicial opinion affirming that decision, were made a part of the record of this case. See app. at 23-31, 51-54