8 So.3d 509 (2009)
John Keith RICHARD
v.
LAFAYETTE FIRE AND POLICE CIVIL SERVICE BOARD.
Nos. 2008-C-1044, 2008-C-1623.
Supreme Court of Louisiana.
February 6, 2009.
Rehearing Denied May 22, 2009.
*510 Briney & Foret, Michael Patrick Corry, Jason Roy Garrot, Lafayette, for applicant.
The Goode Law Firm, William Little-john Goode, Lafayette, for respondent.
WEIMER, Justice.[1]
We granted certiorari in this matter to examine whether reasonable suspicion existed to justify ordering a police officer to submit to a non-random drug screen. After reviewing the record, we conclude the appointing authority did not carry its burden of proving reasonable suspicion as outlined in the police department's policy manual. Thus, we affirm the court of appeal which reversed the dismissal of the police officer.

FACTUAL BACKGROUND
On August 2, 2005, John Keith Richard, a 10-year veteran with the Lafayette City, Police Department, was terminated from his position on the grounds that he had tested positive for stanozolol, an anabolic steroid commonly known by the brand name "Winstrol," in a drug test administered on June 16, 2005. Richard's termination was upheld by the Lafayette Fire and Police Civil Service Board (Board) after a hearing on May 23, 2006. The drug testing and the eventual termination were the result of circumstances surrounding a drug raid conducted by a team of the Lafayette Metro Narcotics Task Force (Metro) on June 9, 2005.
Richard and three other Lafayette police officers had performed authorized offduty security work at Club 410, a nightclub located in downtown Lafayette, Louisiana. Richard was head of security at Club 410. Officers Jason Galatas and Brian Baumgardner worked security there during June of 2005. Officer Trampus Gaspard had worked security there in the past.
Three civilian employees at Club 410, Chad Cormier, Jason Segal, and Jesse Walton, were acquaintances of the police officers. Chad Cormier and Segal lived in different apartments in the same building located on Meaux Boulevard. Segal and Chad's brother, Marc Cormier, shared an apartment that was directly across the hall from Chad's apartment. Walton was plaintiff Richard's roommate in a different complex at another location.
On the evening of June 9, 2005, Officer Jason Herpin[2] was on an assignment with his training officer, Kane Marceaux, and *511 Officer Baumgardner when he received a call on his cell phone from Officer Galatas. Galatas told Herpin that he had some information to share with him that must be kept between the two of them. He reported he had left Segal's apartment about a half hour before where he had seen an ice chest which Segal said contained a stash of marijuana. When he was leaving, Segal told him that he (Galatas) and plaintiff Richard should not go back to the apartment because his roommate (Marc Cormier) had about 20 pounds of marijuana there.
Officer Herpin then text-messaged Officer Baumgardner advising him he had to talk to him about 20 pounds of marijuana. Subsequently, Herpin told Baumgardner and Officer Marceaux about the call from Officer Galatas. Herpin also reported that Galatas wanted to avoid involvement in the investigation because he thought Marc Cormier was the person supplying Officer Gaspard with his steroids.
Baumgardner and Marceaux called their supervisor, Sgt. Gabriel Thompson, and told him they had to talk to him immediately. When Sgt. Thompson returned to the office, Herpin was on the phone with Galatas. Sgt. Thompson took the phone from Herpin; Galatas identified himself and told Thompson he had seen the marijuana about 30 minutes earlier. Galatas stated he would like to be left out of the investigation as much as possible, but did not tell Sgt. Thompson it was because he had heard Officer Gaspard was getting his steroids from that apartment. Galatas also did not relate to Thompson that Segal had warned him about staying away from the apartment.
Sgt. Thompson and Officers Baumgardner, Marceaux, and Herpin got into a police unit and drove to Meaux Boulevard. In route, Thompson contacted Agent Brent Taylor and asked him to meet them with a K-9 unit.
The officers located the Segal/Cormier apartment and knocked on the door. Taylor ran his dog along the door, but with no response. They could hear voices inside the apartment, so Thompson ordered Marceaux to kick the door in. There was no one inside the apartment, the voices having come from a television set. The officers observed an ice chest near the door; they also saw a plate with marijuana in it. Eventually, bottles of steroids and other drug-related items were seized when the apartment was searched pursuant to a warrant.
While all four officers were there, the daughter of the owner of the apartment building arrived and provided information concerning the tenants. Thereafter, the officers knocked on the door of Chad Cormier's apartment and asked if Marc was there. When they were told he was not, the officers had Chad and other occupants cross the hall and wait in the Segal/Cormier apartment.
According to Sgt. Thompson, everything was happening quickly. As supervisor, he was inside the apartment taking pictures of what they had recovered. Thompson was not concerned about safety because they had an adequate number of officers present to have the entrance secured. At some time during the raid, Marceaux and Herpin left the scene to procure a search warrant; Taylor was assigned to park his marked unit across the street in case the suspects returned to the apartment; and Thompson stayed at the apartment.
At the time of the raid, Richard, who had never worked narcotics, was on light duty because he was recovering from surgery. His only involvement with the raid occurred after he received a telephone call from Marc Cormier who reported that plain-clothes policemen, including a K-9 *512 officer, had broken into his apartment. Richard knew that the K-9 officer would be Taylor, so he called him to find out the identity of the agents conducting the raid.
Thereafter, Richard, according to his sworn testimony, called Officer Baumgardner and told him that he had received a phone call from Marc Cormier, who was in the apartment of his brother, Chad, across the hall. Richard was told the officers were busy at the time, and Baumgardner indicated he would call back later. Baumgardner called back and instructed Richard to persuade Marc to return to his own apartment. This instruction was verified by Sgt. Thompson and Baumgardner, neither of whom expressed concern for their safety at the Segal/Cormier apartment.
According to Richard, Marc wanted to flee because he was afraid the police would beat him if he turned himself in. After telling Marc to stay put, Richard talked to Baumgardner again and gave Baumgardner Marc's number so he could convince Marc to surrender.
Shortly after talking to Officer Baumgardner, Marc Cormier turned himself in and was questioned on the scene by Officers Herpin and Marceaux. Marc expressed his belief that Officer Galatas had provided the information that led to the search of his apartment because Galatas knew everything that was going on in the apartment; he did not mention Richard. Additionally, Marc Cormier cooperated with the officers and gave them information about a Dulles Street location where drugs could be found, which resulted in another raid conducted on the same day. Plaintiff Richard was not acquainted with any of the individuals involved in the drugs recovered at that second location.
On the Wednesday following the raid on the Segal/Cormier apartment, June 15, Sgt. Thompson consulted Sgt. Darryl Fontenot, an Internal Affairs (IA) officer, solely to express concerns he had about Officer Galatas; Thompson indicated he did not file drug charges against any police officers. His concern at that time was centered only on Galatas, who had been reluctant to get involved with the drug raid and who had resisted giving his name for the warrant to search the Meaux Boulevard apartment. Additionally, Thompson's concern was that personally he had heard Marc Cormier state that if Officer Galatas "wasn't the one who sent yall to his apartment, he should have [been] because he knows what goes on over here." In his testimony to the Board, Sgt. Thompson denied making any complaints against Officers Gaspard or Richard on Wednesday, June 15. The Board chairman specifically asked Thompson: "Did you not file the complaint on the premise that there was [sic] steroid issues with the gentlemen that are sitting here today, Mr. Gaspard and Mr. Richard?" Thompson's answer was "No, sir." He then explained his "issue was with Galatas." Another member of the Board queried Thompson about Sgt. Fontenot's testimony that Thompson provided him information on June 15 implicating Gaspard and Richard with steroids. Thompson's answer to the Board member was: "No, because specifically... you refer to my [June 16th] statement[;] it only mentions the information I got from Herpin in relation to Agent Gaspard." Thompson verified to the Board that he did not mention anything about Richard to Sgt. Fontenot on June 15.
On June 15, IA Sgt. Fontenot immediately reported Thompson's concerns to his superior on the IA team, Cpt. Mike Lavergne. Lavergne then notified Police Chief Randy Hundley of information derived as a result of a raid on Meaux Boulevard. According to the Chief, Cpt. Lavergne stated that following the raid of the *513 apartment, there was concern about Gaspard, Richard, Galatas, and Herpin. The Chief answered "yes" to: "And at that point, was the decision made by you, as the appointing authority, to have a reasonable-suspicion drug test performed of these four individuals?" When questioned about his reasons for ordering the drug tests of the four officers, the Chief agreed with the following summation. "You had an officer relaying information about possible steroid use [by Gaspard] and steroids being found." "You had another officer [Richard] being engaged with these individuals who were later arrested for illegal drugs." "You had an officer [Galatas] being reluctant to participate in the investigation and give his name." "And you had another officer [Herpin] that it was thought held the information or sat on it for an extended period of time."
Although the drug screening tests were ordered by Chief Hundley, the appointing authority, on Wednesday, June 15, it was not until the next day, Thursday, June 16, that Cpt. Lavergne and Sgt. Fontenot conducted an investigation, recording statements and getting written statements from several officers, including Sgt. Thompson who had first alerted the IA officers about his concerns regarding Officer Galatas. Late in the day of June 16, urine samples were collected from the four suspect officers whom the Chief had ordered to be tested the previous day. Both Gaspard and Richard tested positive for steroids.
In July of 2005, a pre-termination hearing was scheduled and conducted. Both Gaspard and Richard presented evidence of having taken diet supplements, which they blamed for the positive results of steroids in their drug tests. The pre-termination hearing resulted in the termination of the employment of Gaspard and Richard on August 2, 2005.
On May 23, 2006, at the beginning of the hearing by the Board, Gaspard and Richard agreed that their cases would be presented at the same sitting. The Board heard testimony for 12 hours. At the end of the proceedings, the Board voted to reverse Gaspard's termination based on lack of reasonable suspicion to order the drug test.
Contrarily, the Board voted, three to one, to uphold the termination of Richard's employment. Richard perfected an appeal to the district court, which affirmed the Board's decision.
Eventually, Richard appealed to the court of appeal and was successful in having his termination reversed. Richard v. Lafayette Fire and Police Civil Service Board, 07-1010, p. 5 (La.App. 3 Cir. 4/16/08), 983 So.2d 195, 199, reh'g granted, June 18, 2008.[3] The defendants applied for a writ to this court, which we granted. Richard v. Lafayette Fire and Police Civil Service Board, 08-1044 (La.9/19/08), 992 So.2d 967.[4]

*514 DISCUSSION
Any regular employee in the classified service who challenges his discharge as being without "just cause" has a right to a hearing and an investigation by the civil service board. LSA-R.S. 33:2501(A). Any employee under classified service whose termination of employment has been affirmed by a civil service board has a right to judicial review of the decision of the board, which review begins in the district court. LSA-R.S. 33:2501(E). The hearing in district court is confined to a determination of whether the decision made by the board was made in "good faith for cause." LSA-R.S. 33:2501(E)(3). Following an unfavorable decision in the district court, Richard perfected an appeal to the Court of Appeal, Third Circuit. The appellate court reversed the dismissal of plaintiff Richard upon finding that the appointing authority was without "sufficient cause" to order the drug screen, and thus to terminate his employment after the screen was positive for steroids. Richard, 07-1010 at 5, 983 So.2d at 199.
As a tenured employee of the Lafayette Consolidated Government, plaintiff Richard had a continued-employment right that could not be extinguished except pursuant to constitutionally adequate procedures. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); La. Const. Art. 1, § 2; Abel v. City of Kenner Municipal Fire and Police Civil Service Board, 97-1086 (La.App. 5 Cir. 7/28/98), 716 So.2d 451, 452 (Tenured or classified civil service status is a property right and cannot be taken away without due process.). Further, the employment of police officers by the City is governed by La. Const. art. X, Part II, "FIRE AND POLICE CIVIL SERVICE," and LSA-R.S. 33:2471, et seq., which is entitled "FIRE AND POLICE CIVIL SERVICE LAW FOR MUNICIPALITIES BETWEEN 13,000 AND 250,000."
Employment of police officers by the City is also governed by the Lafayette Consolidated Government Policy and Procedure Manual (PPM). The PPM identifies six types of testing for prohibited substances, as follows: post-appointment testing; random testing;[5] reasonable suspicion testing;[6] accident or unsafe practice testing; follow-up testing; and government-required testing.
The propriety of a urinalysis test not ordered pursuant to a random drug testing program is appropriately evaluated according to whether the appointing authority had reasonable suspicion that a particular officer was a user of illegal drugs. Banks v. Department of Public Safety and Corrections, Louisiana Training Institute-East Baton Rouge, 598 So.2d 515, 519, (La.App. 1 Cir.1992), citing Fraternal Order of Police, Lodge No. 5 v. Tucker, 868 F.2d 74 (3d Cir.1989). It is undisputed that on June 15, 2005, Lafayette Chief of Police Randy Hundley ordered Richard to take a reasonable suspicion drug screen. Defendants concede that the only issue before this court is whether the Lafayette Consolidated Government (City) had cause for subjecting Richard to a reasonable suspicion drug test and for imposing discipline for Richard's positive steroid test results. Plaintiff Richard asserts that there was no reasonable *515 suspicion as set out in the PPM 123-1, which states that its purpose is to "eliminate unauthorized drug use (including the unauthorized use of alcohol), drug users, drug activities and drug effects from all work places."
Underlying judicial review of a case of this nature is the task of balancing the government's need for information related to possible drug use by employees with the individual employee's rights pursuant to the Fourth Amendment of the United States Constitution. See Skinner v. Railway Labor Executives' Association, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989) (The government's interests in conducting breath and urine testing, which are warrantless searches under the Fourth Amendment, must be weighed against the privacy interests of the employee.). Louisiana Constitution Article I, § 5 specifies a right to privacy: "Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." These constitutional provisions combine to protect against arbitrarily conducted drug testing.
The government's need for information regarding drug abuse was alluded to by Chief Hundley when he expressed concern about possible use by some of the police officers of mood-changing drugs, specifically anabolic steroids, based on the fact that steroids can cause health problems which endanger the public as well as the individual user. The Chief expressed concern only about substance abuse and did not articulate concern about alleged drug activities by any of the officers.
The rules for the Lafayette Police Department, as a government employer, to use non-random drug tests in order to maintain a drug-free workforce, while observing the individual rights of its employees, are contained in Section 14 of PPM 123-1, which is entitled "Reasonable Suspicion Testing" and which provides in its entirety:
14.1 Testing on the basis of reasonable suspicion may be directed for reasons including, but not limited to, those identified below:
a. When a supervisor has reason to suspect that an employee is under the influence of drugs or alcohol due to the employees's physical condition or unusual behavior while working, or other articulable reasons that would lead a prudent supervisor to be concerned about the individual's safety or the safety of co-workers or the general public.
b. When a supervisor has reasonable suspicion of probable drug or alcohol abuse by an employee or a number of employees based on reliable information such as an unusual amount of accidents, incidents of theft, lost productivity or reports of unusual or unsafe behavior, or other facts that would justify testing specific individuals or groups due to safety concerns.
c. When a supervisor has a reasonable suspicion of possible drug or alcohol abuse based on an employee's excessive absenteeism or a suspicious pattern or trend of absenteeism.
d. When an employee is found in possession of suspected illicit or unauthorized drugs and/or alcohol, drug paraphernalia or when any such items are found in an area controlled or used exclusively or predominately by such employee.
e. When an employee is arrested or convicted for a drug-related offense, is identified as the focus of a criminal investigation into illegal drug possession, use, or trafficking, or when information of illegal drug activities is provided either *516 by reliable or credible sources or by independent corroboration.
14.2 Although reasonable suspicion does not require absolute proof or certainty, mere speculation or hunches are not sufficient to meet this standard. Therefore, before testing on the basis of reasonable suspicion is scheduled, such suspicion must be discussed with, and supported by the Appointing Authority and/or his designee in coordination with the Substance Abuse Program Manager. [p. 831]
In the instant case, the court of appeal observed that defendants apparently admit none of the specific reasons outlined in PPM 123-1 § 14 existed in this case, but point out that these reasons are not exclusive. Richard, 07-1010 at 4, 983 So.2d at 198. Defendants cited the introductory sentence of PPM 123-1 § 14.1 which provides that the listed reasons are not exclusive. Thus, they asserted that Richard's action in involving himself in an unofficial capacity in the drug raid on the Meaux Boulevard apartment, coupled with his association with the residents of that apartment, gave rise to a reasonable suspicion that he was a drug user.
Following the rejection of their argument by the court of appeal, defendants argue to this court that the Chief's ordering of the reasonable suspicion drug test is justified under paragraphs "b" and "e" of PPM 123.1 § 14. This belated argument was contradicted by the testimony of IA Sgt. Fontenot, who took all of the officers' statements on June 16. When asked if he had any proof of reasonable suspicion based on sub-paragraphs "a" through "e" of Section 14 of the PPM, he answered "No." The only fact Sgt. Fontenot articulated was "information of illegal drug activity... provided by either reliable or credible sources or by individual cooperation," but he admitted that this information and any mention of Richard's name came from Officer Herpin's statement which was taken on June 16, the day after the tests were ordered.
Nevertheless, defendants now argue that Richard's drug test was ordered pursuant to reasonable suspicion as provided in paragraph "b" apparently because that paragraph allows suspicion to arise pursuant to the actions of a "number of employees" and this incident involved four police officers being tested.[7] Further, in brief to this court and at oral argument, defendants pointed to a provision in paragraph "e" that they urge justifies the finding of reasonable suspicion because "information of illegal drug activities" was provided by a reliable and credible source (Galatas) and by independent corroboration, the finding of steroids in the Segal/Cormier apartment.[8] We disagree with defendants' arguments for the following reasons.
*517 Because constitutional rights are implicated, the appointing authority has the burden of establishing reasonable suspicion existed before a drug test was ordered. "Reasonable suspicion" is defined as a "particularized and objective basis, supported by specific and articulable facts, for suspecting a person of criminal activity." BLACK'S LAW DICTIONARY 1273 (7th ed.1999). In criminal adjudications, the term has been defined as "articulable knowledge of particular facts which, in conjunction with reasonable inferences drawn therefrom is sufficient to provide reasonable grounds to suspect ... criminal activity." State v. Bickham, 404 So.2d 929, 931 (La.1981). The requirement of reasonable suspicion is a less stringent standard than the probable cause needed for an arrest, but it is more than just a "hunch." The reasonable suspicion standard is well stated in Lafayette's PPM 123.1 § 14.2: "Although reasonable suspicion does not require absolute proof or certainty, mere speculation or hunches are not sufficient to meet this standard." Criteria for determining whether reasonable suspicion exists to warrant a non-random drug test are: 1) the nature of the tip or information; 2) the reliability of the informant; 3) the degree of corroboration; and 4) other facts contributing to suspicion or lack thereof. Razon v. New Orleans Department of Police, 04-2002, p. 8 (La.App. 4 Cir. 2/15/06), 926 So.2d 1, 6, citing Safford v. Department of Fire, 627 So.2d 707 (La.App. 4 Cir.1993); Fraternal Order of Police, Lodge No. 5 v. Tucker, 868 F.2d 74, 78 (3 Cir.1989); Banks, 598 So.2d at 519.
After reviewing the record in this case, we agree with the chairman of the Board, who dissented from the majority's upholding the termination, and with the court of appeal that there was "not sufficient cause to suspect Richard of drug use so as to subject him to `reasonable suspicion' drug screening." Richard, 07-1010 at 5, 983 So.2d at 199.
The Chairman dissented for three reasons: 1) the Chief admitted he used the General Order to call for the drug testing and not the PPM provisions for reasonable suspicion; 2) the City was in violation of its own policy by not consulting with the Substance Abuse Coordination Officer Michael Breaux prior to ordering the drug testing; and 3) the medical review officer process was flawed.
Although Chief Hundley acknowledged he ordered reasonable suspicion testing, he admitted during cross-examination that he was only "vaguely" familiar with the PPM rules regarding reasons for reasonable suspicion. Instead, the Chief made it clear that he considered he had authority to order the testing pursuant to the General Orders of the Lafayette Police Department, GO-201.1,[9] that refers to testing *518 for mood-altering drugs, as well as alcoholic beverages, and allows a supervisor of lieutenant rank or above to request testing. The Chief did not explain how the requirement of GO-201.1, that employees shall not consume such substances "where such consumption is apparent when reporting for duty," was triggered in Richard's case. The Chief summarized his explanation by stating "my decision was based largely on the General Order, which is clear, and my understanding of the General Order, which is that any type of drug that may be a mood-altering drug, that a supervisor may request such a test." The Chief's reliance on the General Order negated any pretenses on his part that he considered whether or not there was the required reasonable suspicion of Richard to support the order for a non-random drug screening. The record reveals the Chief was more concerned with substance abuse and not alleged "illegal drug activities" when he ordered the drug tests be administered.
Thus, although the defendants in argument to this court now rely on the provision related to illegal drug activity to argue reasonable suspicion to justify the testing of Richard, the Chief's testimony undermined that reliance when he testified he relied on provisions which allow testing when an officer reports for duty in an impaired state. Also, as indicated, IA Sgt. Fontenot testified there was no reasonable suspicion based on paragraphs "a" through "e" of Section 14 of the PPM. There is not one scintilla of evidence to support a determination that Richard reported for duty in an impaired state or that he exhibited an impaired state at any time during his ten-year career with the Lafayette Police Department. In sum, the Chief relied on one set of inapplicable provisions to order the testing, and the defendants attempt an after-the-fact justification based on a separate, different set of provisions.
The second reason for the Board chairman's dissent pertains to the provision of PPM, section 14.2, that "before testing on the basis of reasonable suspicion is scheduled, such suspicion must be discussed with, and supported by the Appointing Authority and/or his designee in coordination with the Substance Abuse Program Manager."
Chief Hundley was questioned about his decision made on June 15 to schedule the drug testing and to further investigate on June 16 without any attempt to coordinate the process with the Substance Abuse Program Manager, who was Michael Breaux. He stated: "Due to the nature of the IA (Internal Affairs) and also the criminal investigation going on at the time, we wanted as few people that's [sic] possibly involved." This testimony was consistent with the testimony of Sgt. Fontenot that his opinion was "the fewer, the better."
Nevertheless, the City violated its own policy, as noted by the dissenting Board member, which in mandatory terms requires consultation with a Substance Abuse Program Manager before testing is ordered. The purpose of this provision is to require that the appointing authority consult with Substance Abuse Program Manager and establish reasonable suspicion before the drug test is ordered. The defendants were unable to point to any exception to this mandatory provision and we have found no exception. This failure to comply with the rule's mandatory obligation to consult with the Substance Abuse Program Manager prior to ordering the *519 testing underscores the Chief's use of the general provision rather than the reasonable suspicion provision of the City's written policies.
Finally, it was undisputed that after Richard's test was reported positive for steroids, Richard was contacted by the son of the medical review officer (MRO) and not a qualified MRO as defined by law.[10] Louisiana's comprehensive drug-testing procedures are set forth in Chapter 14 of Title 49 of the Revised Statutes, which is entitled "DRUG TESTING," and consists of LSA-R.S. 49:1001-1005. Pursuant to this legislation, analysis of samples collected from individuals "in residence in the state" and of samples collected in Louisiana shall be performed by laboratories that are certified by the federal Substance Abuse and Mental Health Services Administration (SAMHSA) or a CAP-FUDT-certified laboratory, that is, a laboratory certified for forensic urine drug testing by the College of American Pathologists. LSA-R.S. 49:1001(1)(7) and 49:1005(A).
Of particular importance are the provisions of PPM 123-2 (7.1n) and (10.1) that detail the responsibilities of the MRO in a case such as the instant one. In general, the MRO's duties are to interpret, evaluate, and monitor the drug testing program. Specifically, the MRO receives all drug test results from the laboratory and reviews those results prior to transmission of the results to the City's administrators and/or the Substance Abuse Program Manager. This review, to determine whether the employee has passed or failed the drug test, "will be based on a consideration of several factors including, but not limited to: alternative medical explanations for confirmed positive results; medical interviews with the employee/candidate; the employee's/candidate's medical history; relevant biomedical factors; and all medical records made available by the employee/candidate." PPM 123-2 (7.1n).
This flaw in the proceedings against Richard was also duly noted by the dissenting Board member as well as one of the board members who cast his vote with the majority.
The court of appeal observed that prior to the Chief's ordering the drug tests on June 15, no substantial investigation was conducted, and there was no suggestion that Richard's behavior suggested drug use. No evidence was introduced of any other incident, action, or behavior during Richard's ten years as a police officer that suggested he might be a drug user. Indeed, Richard's employment record was exemplory. He had been with the police department since 1995. He was qualified as a defensive tactics instructor/trainer, an instructor with pepper spray, ground fighting, and active shooter.
Although Richard had been a K-9 officer for a number of years, he was the point man on the squad team in June of 2005. He explained that when a raid takes place, the point man is the first officer through the door, and he is armed with a shield and a handgun. His position required that he remain in top physical condition. For the past five to six years, he had worked out at a health club six days per week for one to two hours per day.
*520 According to the defendants, suspicion of Richard was merely twofold: his acquaintance through another job with suspected drug users and his phone calls to officers participating in a drug raid. The court of appeal concluded the "guidelines set out in PPM 123-1 § 14 do not provide for reasonable suspicion sufficient to require drug screening based on guilt by association or on a single instance of bad judgment." Richard, 07-1010 at 5-6, 983 So.2d at 199.
As to "guilt by association," we note that, in a criminal context, guilt must be based on personal action, statements, or knowledge, not on association with other persons suspected of criminal conduct. Sawyer v. Sandstrom, 615 F.2d 311, 316-317 (5 Cir.1980). However, in this matter the standard is not guilt, but is reasonable suspicion. The Louisiana Code of Criminal Procedure provides in Article 215.1 that a law enforcement officer may stop a person in a public place whom he "reasonably suspects" is committing, has committed, or is about to commit an offense. Although association with individuals involved in drugs may establish reasonable suspicion in the appropriate circumstances, the record in this matter indicates that at the time of the drug test order Richard merely had an acquaintance with Marc Cormier through Marc's brother Chad and Marc's roommate Segal.
Suspicion of drug abuse sufficient to justify non-random testing should be particularized as to the individual employee to be tested. "The principal issue involved in cases of `reasonable suspicion' drug testing is whether, in fact, the requirement of individualized reasonable suspicion is satisfied." (Emphasis supplied.) L. CAMILLE HEBERT, 1 EMPLOYEE PRIVACY LAW § 3.19 (West 2008). "The courts have been the most accepting of reasonable suspicion drug testing that is conducted because of an individualized belief or suspicion that the particular employee being tested has used illegal drugs or is under the influence of drugs." Id.;[11]see Banks, 598 So.2d 515 (Individualized information was that correctional institution employee was seen in uniform entering and leaving a crack house under surveillance; confidential informant inside the house reported seeing employee smoking crack inside the house.). Under proper circumstances, group activity that exhibits highly suspect behavior has been held sufficient to order non-random drug testing of police officers. Tucker, 868 F.2d 74 (Anonymous informant reported four officers congregating in neighborhood and exhibiting behavior ("acting crazy") indicative of drug use; investigation corroborating the tip was conducted prior to the drug testing being ordered.). In the instant case, the only connectivity between the four officers who were tested is that the alleged reasonable suspicion arose with the conduction of the drug raid. There was no individualized belief that Richard was a drug abuser.
As to the telephone calls Richard made after he was contacted by Marc Cormier, we cannot call that an "act of bad judgment" based on this record. We agree with Richard that he did exactly what he *521 should have done: he put the Metro agents in touch with the resident of the apartment and facilitated the resident's surrender to police. The officers at the scene of the drug raid did not believe the call by Richard during the drug raid was inappropriate or put them at risk. At worst, one of the officers stated it was somewhat "odd." Richard's actions in facilitating Cormier's surrender had an even more widespread and beneficial effect in that Cormier told the agents of another location which they then proceeded to raid. Had Richard simply ignored Cormier's call and refused to act, thereafter he could have been faulted for failure to disclose relevant information to the Metro Task Force in a timely fashion.
In deciding whether the Chief, as appointing authority in this civil service matter, had reasonable suspicion to order the non-random drug screen the determinative factor is what facts the Chief had knowledge of on June 15, the day he informed the IA officers that the four officers should be tested. Specifically as to Richard, the Chief confirmed that Richard was "being engaged with these individuals who were later arrested for illegal drugs."[12] In addition to the word "engaged" being ambiguous, the record indicates that at the time the test was ordered, the only evidence of a relationship between Richard and Marc Cormier was the fact Cormier called Richard while his apartment was being raided by police and Richard contacted the agents who were conducting the raid. The mere fact Richard received a phone call from one who was involved with drugs does not establish reasonable suspicion that Richard himself was involved in illegal drug activities. Apparently, this was the only information the Chief had as to Richard, because the Chief did not articulate any other information and Sgt. Thompson's unequivocal testimony was that he did not mention Richard to the IA officers on June 15, prior to the test being ordered.
Reasonable suspicion was not adequately established based on this record. The record is, at best, confused as to what the Chief knew at the time he ordered the testing. Defendants cannot rely on information acquired after the Chief ordered the tests to justify his ordering the tests. Factors which contribute to the confusion are the Chief's articulated belief he did not need reasonable suspicion, his reliance on the general rules, and the fact the investigation by IA was conducted after the test was ordered. As noted, the City violated its own mandatory rules which require consultation with the Substance Abuse Program Manager before any testing is ordered and failed to comply with the medical review officer process. Both of these requirements serve as a protection against arbitrarily ordered tests. If an officer reports to work apparently under the influence of drugs, that fact in and of itself establishes reasonable suspicion. As we have noted, there was not a scintilla of evidence showing Richard exhibited symptoms of drug use. Because constitutionally protected rights are implicated, the appointing authority's burden was to point to facts known at the time the test was ordered which support reasonable suspicion. That burden was not met by the City based on this record.

CONCLUSION
Although reasonable suspicion is not a substantial burden to meet, to adequately *522 protect and safeguard the constitutionally recognized due process and privacy rights of employees, reasonable suspicion must be established based on articulable facts uncovered before drug testing is ordered. An intrusion into one's right to privacy, consisting of ordering the taking of a urine sample,[13] cannot be justified based on an investigation conducted after the test is ordered. Because constitutional rights of the person tested are implicated, the burden is on the appointing authority to establish reasonable suspicion before the test is ordered. Mandatory rules established within a policy manual cannot be ignored for the sake of expediting the process.
Following a review of the record, we find the reasons stated by the dissenting Board member to be well supported by the record. Additionally, we agree with the court of appeal's analysis of the record in reaching the conclusion that the appointing authority, the Chief of the Lafayette Police Department, did not establish in this record that he had reasonable suspicion to order a non-random drug test of Officer John Keith Richard at the time the test was ordered.
Accordingly, in 2008-C-1044, consolidated with 2008-C-1628, we affirm the judgment of the court of appeal in favor of Officer John Keith Richard.
JUDGMENT AFFIRMED.
JOHNSON and KNOLL, JJ., dissent and assign reasons.
VICTORY, J., concurs.
TRAYLOR, J., dissents for reasons assigned by KNOLL, J.
JOHNSON, Justice, dissents and assigns reasons.
I would reverse the decision of the Court of Appeal.
In my mind, the Lafayette Fire and Police Civil Service Board and the Lafayette Parish Consolidated Government correctly concluded that Mr. Richard's actions in involving himself in an unofficial capacity in a drug raid on the Meaux Avenue Apartment, and his association with the residents of that apartment, gave rise to a "reasonable suspicion" that he was a involved in illicit drug activity. I submit that while none of the specific reasons outlined in PPM 123-1 § 14 existed in this case, the reasons set forth in the Lafayette Consolidated Government Policy and Procedure Manual (PPM) 123-1 § 14 PPM 123-1 are not exclusive reasons for "reasonable suspicion."[1] To conclude otherwise *523 would mean that the appointing authority, presented with facts that suggest a criminal violation by an employee, cannot conduct drug testing to determine whether the employee should be disciplined terminated and/or arrested.
In this case, we have John Keith Richard ("Richard"), a 10-year veteran of the Lafayette City Police Department, who also worked as head of security at the Club 410 in Lafayette, Louisiana. The only question before this Court is whether a Municipal Police Department may order a Police Officer to undergo drug testing when it receives reliable information that suggests the employee may be involved with illegal drug activity.
Officer Jason Herpin ("Herpin"), who was a member of the Metro Narcotic Task Force, received information from another officer, Jason Galatas ("Galatas"), who observed an ice chest that contained marijuana in an apartment occupied by Marc Cormier ("Cormier") and Jason Segal("Segal") on Meaux Avenue. Segal and Cormier's brother, Chad, were civilian employees of Club 410, where Herprin worked an off-duty security detail.
Herprin relayed the information to the Metro Narcotic Task Force, Sergeant Gabriel Thompson ("Thompson"), Major Brian Baumgardner ("Baumgardner"), Officer Kane Marceaux, and Herpin conducted the raid at the Segal/Cormier Apartment. While en route, Thompson contacted Agent Brent Taylor and asked him to meet them with a K-9 unit. The officers located the Segal/Cormier Apartment and knocked on the door. Taylor ran his dog along the door, with no response. Thompson ordered Marceaux to kick the door in. The officers observed an ice chest near the door; they also saw a plate with marijuana in it. Eventually, bottles of steroids and other drug paraphernalia were seized when the apartment was searched pursuant to a warrant.
While the raid was in progress, Cormier contacted Richard to report that plainclothes policemen, including a K-9 officer, had broken into his apartment. Richard knew that the K-9 officer would be Taylor, and called him to find out the identity of the agents conducting the raid. Richard contacted Baumgardner who informed him about the marijuana investigation in progress at Segal/Cormier's Meaux Avenue Apartment. Richard informed Baumgardener that he received a phone call from Cormier, who was in another apartment across the hallway. Baumgardner instructed Richard to persuade Cormier to return to his own apartment. Then, Richard contacted Cormier and told him to stay put. Richard again called Baumgardner and gave him Cormier's phone number, so he could convince Cormier to surrender.
Police Chief Randy Hundley ("Hundley"), as the appointing authority, made the decision to have a "reasonable suspicion" drug test performed on these four *524 police officers. Richard tested positive for Stanozolol, an anabolic steroid, commonly known by the brand name "Winstrol," and muscle building substance, which is a Schedule III narcotic.
I disagree with the majority's conclusion that Captain Hundley did not establish reasonable suspicion to order the drug test of Officer Richard. Hundley had reliable information concerning the possible steroid use among his officers, combined with Richard's involvement with individuals who were later arrested for illegal drugs. Based on these factors, he had reasonable suspicion to order the drug screening tests in accordance with the provisions set forth in the general orders of the Lafayette Police Department.
If we are to rid our communities of crime and illegal drug usage, we must hold the men and women who are sworn to protect and serve our communities, to a higher standard. Therefore, I find no justification, excuse or rationale for a positive drug test of a veteran police officer, such as Richard, whether it is a random or nonrandom drug test.
While there was no evidence in the record that would provide proof of possession or distribution of steroids by Richard, LSA-R.S.40:968(C), provides that it is unlawful for any person to knowingly or intentionally possess a controlled dangerous substance classified in Schedule III. Richard's action during the raid, amounts to obstruction and/or interference, at the very least.
KNOLL, Justice, dissents.
Respectfully I dissent from the majority's affirmation of the appellate court's decision that the appointing authority lacked reasonable suspicion to require plaintiff, an employee of the Lafayette City Police Department, to undergo testing for prohibited substances. The majority acknowledges that the Board and the Government correctly pointed out that the reasons outlined in PPM 123-1 § 14 are not exclusive. To require an officer to undergo testing requires reasonable suspicion the officer uses and/or abuses and/or possesses drugs, based upon specific objective facts and reasonable inferences drawn from those facts.
As a premise, we recognize that it is reasonable for a governmental employer to order an employee to submit to a drug test on the basis of individualized suspicion in certain circumstances. George v. Dep't of Fire, 93-2421, p. 5 (La. Ct.App. 4 Cir. 5/17/94), 637 So.2d 1097, 1101; Banks v. Dep't of Public Safety and Corr., 598 So.2d 515, 518 (La. Ct.App. 1 Cir.1992). In the present matter, the record shows that on June 15, 2005, when Lafayette Chief of Police Randy Hundley ordered Richard to take a reasonable suspicion drug test, he knew that Richard, who had never worked in narcotics, contacted K-9 Agent Brent Taylor while Taylor and other officers were conducting the raid on the Segal/Cormier apartment which contained drugs. Also known to the Chief at the time he ordered the test was the fact that Richard received a phone call from Marc Cormier while the raid was taking place; this prompted Richard to make his call to Taylor. These circumstances of Richard's engagement with individuals later arrested for illegal drugs, his receipt of a phone call from the target of the investigation while the apartment was being raided, and his phone call to one of the officers during the raid constitute sufficient reasonable suspicion for a drug test, in my view.
An investigatory stop based upon reasonable suspicion requires only "some minimal level of objective justification". United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting Immigration & Naturalization *525 Serv. v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)); State v. Walker, 06-1045, p. 6 (La.4/11/07), 953 So.2d 786, 790. Reviewing courts must look to the "totality of the circumstances" of each case in determining whether the officers possessed the requisite reasonable suspicion. United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)); State v. Temple, 02-1895, p. 5 (La.9/9/03), 854 So.2d 856, 860. The "reasonable suspicion" threshold is a very low one; it does not rise to the level of probable cause but only requires the articulation of something more than an "inchoate and unparticularized suspicion or `hunch'". Sokolow, 490 U.S. at 7, 109 S.Ct. at 1585 (quoting Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 899 (1968)); PPM 123-1, § 14.2. Chief Hundley possessed more than mere speculation or a hunch; the totality of circumstances known to him when he ordered the test constituted reasonable suspicion.
The majority additionally errs in finding support for its decision from the Chief's failure to coordinate the test with the Substance Abuse Program Manager in accordance with PPM 123-1 § 14.2. The majority finds the language in Section 14.2 to be mandatory, but fails to provide any analysis to support this conclusion. Statutes may be classified generally as either mandatory or directory. Sanders v. Dep't of Health and Human Resources, 388 So.2d 768, 770 (La.1980). If mandatory, they prescribe, in addition to requiring the doing of the thing specified, the result to follow, i.e., a penalty, if the required action is not taken. Marks v. New Orleans Police Dep't, 06-0575, p. 10 (La. 11/29/06), 943 So.2d 1028, 1035; Sanders, 388 So.2d at 770. Provisions designed to secure order, system, and dispatch by guiding the discharge of duties are usually construed as directory even if worded in the imperative. Marks, 06-0575 at p. 11, 943 So.2d at 1035; Sanders, 388 So.2d at 770. Pursuant to the jurisprudence of this Court and sound statutory construction principles, I find the statutory language to be directory rather than mandatory. Directory meaning is the proper construction to give in cases involving prospective action of government officials if the law's purpose is the protection of the government by guidance of its officials rather than the granting of rights to private citizens affected. Sanders, 388 So.2d at 771. Thus, it is erroneous to conclude the drug testing of this officer was invalid for the Chief's failure to discuss and coordinate the test with the Substance Abuse Program Manager.
The majority additionally finds support for reversing the decision to terminate Mr. Richard because Mr. Richard was contacted by the MRO's son and not the MRO. The majority does not demonstrate what, if any, provision this violates. The MRO's duties are to interpret, evaluate, and monitor the drug testing program, receiving all results from the laboratory and reviewing those results prior to transmission of those results to the City's administrators and/or the Substance Abuse Program Manager. There is no allegation by plaintiff that the MRO failed to comply with any of these requirements.
For these reasons, I find the appellate court erred in reversing the district court's judgment affirming the Board's decision to terminate Mr. Richard and this Court errs in affirming that decision.
NOTES
[1] Calogero, C.J., retired, participated in this decision which was argued prior to his retirement.
[2] Officer Herpin had done undercover work at Club 410 in the past, but was a newly assigned member of a Metro team on the date of the raid.
[3] On rehearing, the court of appeal assessed costs in the amount of $5,275.79 against the City.
[4] In a separate application, the City sought a writ for review of the court of appeal's assessment of costs against the City on rehearing. We granted a writ pursuant to this application in order to have the entire matter before us. Richard v. Lafayette Fire and Police Civil Service Board, 08-1623 (La.9/19/08), 992 So.2d 967. However, in light of our decision to affirm the judgment of the court of appeal, we hereby withdraw the grant of the writ. Specifically, as to costs, although the district court may assess costs in any manner that it considers equitable, the court of appeal also "may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable." LSA-C.C.P. art. 2164.
[5] Section 13, entitled "Random Testing," is defined as "testing of employees in certain identified, safety or security-sensitive positions... conducted on a random basis." PPM 123-1 (13.1).
[6] A reasonable suspicion drug test should be contrasted with a truely random drug test where an employee is chosen for testing by chance.
[7] The defendants claim to rely on various facts to justify ordering the testing of Richard. However, many of the facts cited have no relation to Richard, such as the alleged statement by Officer Galatas that Officer Gaspard was obtaining steroids from the raided apartment and reluctance by Officer Galatas to cooperate with the Metro squad during the raid. Other facts were uncovered after the Chief ordered the test of Richard, such as specific information about Richard's previous visits to the apartment where the drug raid occurred. See also, footnote 8, infra.
[8] As part of this argument, defendants point to testimony in the record that a picture of Richard's roommate, Jesse Walton, was found in the raid of the Segal/Cormier apartment and that it depicted him smoking what appeared to be a marijuana cigarette. Testimony regarding this fact was given by Sgt. Fontenot, who stated the "Officer Herpin found a picture of Jesse Walton smoking a marijuana cigarette-or what they suspected to be marijuana." Although Fontenot testified at the hearing prior to Herpin's testimony, Herpin was not asked to verify this information. Nevertheless, it is apparent from the testimony that this fact was not known by the appointing authority at the time Richard's drug test was ordered. As such, the photograph cannot be considered in determining whether reasonable suspicion was established before the test was ordered.
[9] The purpose of the "General Orders" referenced by the Chief is establishment of general conduct expected of each employee. The specific section referenced is GO-201.1(B), entitled "Intoxicants," which provides, in pertinent part:

1. Employees shall not consume alcoholic beverages or mood altering drugs where such consumption is apparent when reporting for duty. Apparent is defined as any physical symptoms that a supervisor shall interpret as indicative of alcohol use. A supervisor of Lieutenant rank or above may instruct any employee to submit to a chemical test in order to determine blood alcohol level when, in the supervisor's opinion, that employee exhibits signs of alcohol use. A blood alcohol level of .01 grams percent weight by volume or greater for commissioned personnel and .04 grams percent or greater for civilian employees shall result in disciplinary action. When an employee is requested to take such a test he shall submit.
[10] LSA-R.S. 49:1001 provides, in pertinent part:

(4) "Medical review officer" means a licensed physician responsible for receiving laboratory results generated by employer or testing entity's drug testing program who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate an individual's positive test result together with his medical history and any other relevant biomedical information.
This definition is also contained in PPM 123-1(20.1).
[11] See, e.g.: American Federation of Government Employees, AFL-CIO v. Roberts, 9 F.3d 1464, 1468 (9 Cir.1993) (Correctional institution must show employee's performance, appearance, behavior, speech or odor in some way reflects drug use; a guess is not enough to justify reasonable suspicion testing.); Hansen v. California Dept. of Correction, 868 F.Supp. 271, 272 (N.D.Cal.1994)(Employee's admission of one episode of marijuana use during her eight-year period of employment was sufficient reasonable suspicion.) Compare, Reeves v. Singleton, 994 S.W.2d 586 (Mo. App. W.D.1999) (Uncorroborated anonymous telephone calls were insufficient to raise reasonable suspicion.)
[12] At the time of the Board hearing, the identity of persons charged and the nature of the charges that arose from the raid on the Meaux Boulevard apartment were not provided.
[13] See Skinner, 489 U.S. at 617, 109 S.Ct. at 1413, quoting National Treasury Employees Union v. Von Raab, 816 F.2d 170, 175 (5 Cir.1987): "There are few activities in our society more personal or private than the passing of urine.... It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom."

In the instant case, Sgt. Fontenot accompanied Richard to the bathroom to witness the giving of the sample.
[1] Section 14 of PPM 123-1 provides for nonrandom drug tests as follows:

14.1 Testing on the basis of reasonable suspicion may be directed for reasons including, but not limited to, those identified below:
a. When a supervisor has reason to suspect that an employee is under the influence of drugs or alcohol due to the employee's physical condition or unusual behavior while working, or other articulable reasons that would lead a prudent supervisor to be concerned about the individual's safety or the safety of co-workers or the general public.
b. When a supervisor has reasonable suspicion of probable drug or alcohol abuse by an employee or a number of employees based on reliable information such as an unusual amount of accidents, incidents of theft, lost productivity or reports of unusual or unsafe behavior, or other facts that would justify testing specific individuals or groups due to safety concerns.
c. When a supervisor has a reasonable suspicion of possible drug or alcohol abuse based on an employee's excessive absenteeism or a suspicious pattern or trend of absenteeism.
d. When an employee is found in possession of suspected illicit or unauthorized drugs and/or alcohol, drug paraphernalia or when an such items are found in an area controlled or used exclusively or predominately by such employee.
e. When an employee is arrested or convicted for a drug-related offense, is identified as the focus of a criminal investigation into illegal drug possession, use, or trafficking, or when information of illegal drug activities is provided either by reliable or credible sources or by independent corroboration.